Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
Connor H. Shea, Esq.
Nevada Bar No. 14616
Schwartz Flansburg PLLC
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741
*Proposed Attorneys for the Debtor*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | ) Case No.: 18-10792-LED |
| | ) |
| Lucky Dragon Hotel & Casino, LLC, | ) Chapter 11 |
| | ) |
| Debtor. | ) Hearing Date: |
| | ) Hearing Time: |

**DEBTOR'S MOTION FOR ORDER PURSUANT TO 11 U.S.C.
§§ 105(a), 363(b), 1107(a) AND 1108 AUTHORIZING, BUT NOT
DIRECTING, THE DEBTOR TO HONOR CERTAIN PREPETITION
OBLIGATIONS AND MAINTAIN CUSTOMER PROGRAMS**

Lucky Dragon Hotel & Casino, LLC, the above-captioned debtor and debtor-in-possession (the "**Debtor**"), hereby moves this court (the "**Motion**") for the entry of an order authorizing, but not directing, the Debtor to (a) pay certain prepetition claims of various casino patrons, and (b) maintain its customer programs pursuant to sections 105(a), 363(b), 1107(a) and 1108 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**").  In support of the Motion, the Debtor respectfully states as follows:

1

**Jurisdiction**

1.      This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a) and 363(b) of the Bankruptcy Code.

**Background**

3.      The Lucky Dragon Hotel & Casino is the first casino resort in Las Vegas designed from the ground up to create an authentic Asian cultural and gaming experience.  Opened in November 2016, the casino property originally started with: (i) a 27,500 square foot, two-level casino; (ii) 37 gaming tables and 287 slot machines; (iii) 203 hotel rooms, including 14 suites and a penthouse; (iv) 4 Asian inspired restaurants; (v) 3 bars and lounges; and (vi) a first class spa (collectively, the "**Resort**").  Currently, the enterprise employs 98 people and is primarily operating only the hotel and limited food and beverage service; however, when fully operating, it is projected the Resort will employ 475 people.

4.      The Lucky Dragon anticipates that once its operation is stabilized through either the reorganization or sale of the Property, it will be profitable by capitalizing on the underserved Asian gaming community and customers, as well as the growth of the local market on the North Strip.  The Debtor's initial core customers consisted of the local Las Vegas Asian and non-Asian market, the regional Asian population, including Los Angeles and San Francisco, and the International Asian visitor, including travelers from Mainland China, Taiwan and Canada.  Indeed, nearly 5 million Asian Americans live in California alone, and 200,000 more live in Las Vegas.   The Debtor anticipates that with a proper marketing budget and the sufficient

stabilization of its operations, coupled with the growth of and development of the North Strip corridor, including the expansion of the Las Vegas Convention Center, the Resort will flourish, particularly in the local Las Vegas market.

5.    The Lucky Dragon Hotel and Casino primarily consists of 2 entities.  Lucky Dragon, LP, which owns the real estate and improvements at 300 West Sahara Avenue, Las Vegas, Nevada (the "**Property**"), and employs 68 full time and 30 part-time people.  The gaming, hotel and resort operations are then owned and controlled by the Debtor, the Lucky Dragon Hotel and Casino, LLC, which also leases the 98 employees from Lucky Dragon, LP. The capital structure between the companies includes approximately 179 individuals who invested $500,000 each, or $89,500,000 in Lucky Dragon, LP, through the Immigrant Investor Program, or what is commonly referred to as EB-5 investments.[1] In addition, the enterprise is encumbered by 2 loans from Snow Covered Capital, LLC ("**Snow Covered**"), including an initial $30,000,000 construction loan facility, as well as a $15,000,000 revolving loan (collectively, the "**Snow Covered Loans**").  The Loans, in turn, are secured by a deed of trust dated May 3, 2016, and recorded against the Property. As of the date hereof, Lucky Dragon Holdings owes Snow Covered approximately $48,877,969.15.

6.    On September 1, 2017, Snow Covered recorded a Notice of Default with the Clark County Recorder, starting the foreclosure process with respect to the Property.  As of the Petition Date, a foreclosure sale is set for February 22, 2018.  In order to reorganize, preserve 98 jobs, facilitate the orderly payoff of Snow Covered, and the goodwill of the Resort, the Debtor filed its Chapter 11 case.  Looking forward, the Debtor anticipates a quick auction, which will

---

[1]    An EB-5 visa is an opportunity for qualified foreign investors to obtain a Green Card for themselves or their families through the Immigrant Investor Program, which was established by Congress in 1992.  The EB-5 program authorized the U.S. Citizenship and Immigration Services to grant Green Cards to foreign investors who help create or save jobs for U.S. citizens.  In this case, the Debtor and Lucky Dragon, LP qualified for the EB-5 program.

pay Snow Covered in full, provide fresh capital, and reenergize the project, such that it can become profitable and expand into full operation as quickly as possible.

7.      Indeed, the Debtor filed its case in good faith, to preserve jobs, pay its creditors and provide certainty to the market with respect to the Property and the Resort.  In order to facilitate its quick emergence from bankruptcy, the Debtor retained Spectrum Gaming Capital ("**SGC**") as its financial advisor.  Prior to the filing, the Debtor, through SGC, started actively showing the Property and the Resort to interested parties, many of whom expressed serious interest in the assets and in amounts that would pay Snow Covered in full.  Therefore, the Debtor anticipates running a quick, but thoughtful auction of the Property and Resort, so that not only are Snow Covered's secured claims are protected, but unsecured creditors are also given an opportunity to recover for their claims, and EB-5 investors are given an opportunity to preserve their investments, to the extent each are possible.  Accordingly, the Debtor believes a Chapter 11 sale process in this case is the best opportunity for all interested parties to preserve and maximize the value of the Property and the Resort.

8.       In the ordinary course of operating its hotel and casino, the Debtor routinely issues slot vouchers and gaming chips of various denominations in order to facilitate its customer's ability to place wagers on the casino floor.  The Debtor surmises that many Lucky Dragon patrons currently possess gaming currency issued by the Debtor (the "**Outstanding Gaming Currency**"). Although difficult to estimate the precise amount of Outstanding Gaming Currency, the Debtor routinely accounts for the amount of Outstanding Gaming Currency.  As of the Petition Date, the Debtor estimates that its patrons are in possession of approximately $50,000 in Outstanding Gaming Currency.

9.      Additionally, the Debtor offers several promotional offerings, rewards clubs, and loyalty programs (the "**Customer Programs**") which cater to Lucky Dragon casino-goers. Through operation of the Customer Programs, Lucky Dragon patrons can earn discounted hotel rooms, parking upgrades, VIP passes to various events, and rewards points for use within the hotel and casino.  The Customer Programs are critical to the Debtor's business; particularly, they promote brand loyalty, enhance the customer experience at the Lucky Dragon, and help generate the revenue stream with which the Debtor relies upon to operate.

10.      First, the Debtor's most ubiquitous Customer Program is its property-wide Dragon Club. Through the Dragon Club, most purchases, hotel stays, and wagers at the Debtor's hotel and casino allow the guest to earn rewards points.

11.      The rewards points, in turn, can be redeemed by a participating member for discounted accommodations, meals, or wagers at the Lucky Dragon. More points correspond with more attractive benefits and privileges. The rewards points accumulated by each member of the Dragon Club generally remain outstanding unless they are redeemed or forfeited.  As of the Petition Date, the Debtor estimates approximately $5,000 in Customer Program obligations remain outstanding.

12.      Second, the Debtor presents certain casino patrons and hotel guests with a variety of individualized offers and accommodations. Substantially all of these customer offers are bespoke, custom designed offerings based on the particular preferences of the customer and are delivered through direct marketing campaigns.  By way of example, when the casino is operating, an offer can include free play credits on the patron's casino game of choice, complimentary hotel stays, complimentary meals and free event tickets, among others. The

4826-8429-8330, v. 4

Debtor generally only incurs an obligation with respect to the aforementioned offers when such offers are accepted and redeemed.

13.    As part of their normal business operations, the Debtor relies upon the members of the Customer Programs, and other patrons, to frequent its hotel and casino in order to continue their business operations. The debtor will continue to require the same during the pendency of the Chapter 11 Case.  As such, the importance of maintaining the administration of the Customer Programs is paramount to the Debtor's ability to compete in the highly competitive gaming and entertainment space in Southern Nevada. Without maintenance of the Customer Programs, the Debtor's business will suffer as a result of diminished confidence in the ongoing operation of the Lucky Dragon.

14.    Indeed, failure to maintain the Customer Programs will likely inhibit the Debtor's ability to complete a successful reorganization. Failure to honor the Customer Programs will inevitably lead to the loss of a substantial segment of the Debtor's customer base, which will likely turn to any of the Debtor's competitors, namely the numerous hotel and casino offerings available in Las Vegas, Nevada.  Moreover, failure to honor certain of the Customer Programs likely constitutes a violation of various state gaming laws and regulations. See, e.g., NRS 463.

15.    In sum, the Debtor believes it is in the best interests of its estate and all of its creditors that it obtain authority to pay holders of Outstanding Gaming Currency and maintain the Customer Programs, in the ordinary course of business, as preserving the Customer Programs during the Chapter 11 Case is critical to protecting the Debtor's operations and preserving the value of the business for the benefit of the estate.  Therefore, the Debtor seeks authority from this Court to satisfy certain prepetition obligations and maintain administration of each of the Customer Programs in the ordinary course of business.

4826-8429-8330, v. 4

**Relief Requested**

16.     By this Motion, the Debtor seeks an order of this Court authorizing, but not directing the Debtor, in its business judgment, to pay certain prepetition obligations related to the Outstanding Gaming Currency and to maintain administration of the Customer Programs.

**Basis for Relief**

17.     Section 105(a) of the Bankruptcy Court empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Under Section 105(a), a court "can permit pre-plan payment of a prepetition obligation where essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D.Va. 1992); see also, In re Just for Feet, Inc., 242 B.R. 821, 826 (D.Del 1999) ("To invoke the necessity of payment doctrine, a debtor must show that payment of the prepetition claims is critical to the debtor's reorganization.")(internal quotation omitted).

18.     Section 363(b) of the Bankruptcy Code allows a debtor in possession to use, sell, or lease property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). Bankruptcy courts have approved the payment of critical vendor claims in circumstances where the payments are necessary to protect a debtor's business operations from substantial disruption. See, e.g., In re Tropical Sportswear Int'l Corp., 320 B.R. 15, 20-21 (Bankr. M.D. Fla. 2005) (allowing critical vendor payments where interruption in flow of goods would "substantially jeopardize the Debtors' ability to conduct business"). Courts have authorized payment of prepetition obligations under Section 363 of the Bankruptcy Code where a sound business purpose exists for doing so. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989)(finding that a sound business justification existed to justify payment of certain claims).

7

4826-8429-8330, v. 4

19.     Furthermore, pursuant to Bankruptcy Code sections 1107(a) and 1108, the Debtor is a fiduciary "holding the bankruptcy estate[s] and operating the business for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." Id. Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.

20.     Importantly, this Court, as well as other bankruptcy courts around the country, routinely approve the relief requested in this Motion. See In re Zen Entertainment, Inc., No. 13-10590 (Bankr. D. Nev. Feb 4, 2013); In re Jerry's Nugget, Inc., No. 12-19387 (Bankr. D. Nev. Aug. 17, 2012); In re Riviera Holdings Corp., No. 10-22910 (Bankr. D. Nev. Jul. 25, 2010); In re 155 East Tropicana, LLC, No. 11-22216 (Bankr. D. Nev. Aug. 9, 2011); and In re Caesars Entertainment Operating Company, Inc., et al, No-15-01145 (Bankr. N.D. Ill. Jan. 15, 2015).

21.     The Debtor considers the holders of Outstanding Gaming Currency and continuation of their Customer Programs critical to their operations because the continued patronage of the Debtor's resort hotel and casino provide the Debtor with a revenue stream that is essential to the Debtor's business; and (b) failure to honor the Outstanding Gaming Currency or maintain the Customer Programs would result in the loss of customers which would be detrimental to the Debtor's successful reorganization.

22.     Here, the Debtor operates in a highly competitive environment, where customer satisfaction and the ability to maintain repeat business through exceptional customer service are of critical importance. Indeed, customer satisfaction is a key component of the Debtor's business. Retaining current customers and attracting new customers will ultimately increase the

4826-8429-8330, v. 4

Debtor's revenue and therefore promote their efforts to successfully reorganize. Accordingly, the Debtor does not want to risk an unnecessary interruption in the operation of its business. The Debtor enjoys relationships with various customers who currently hold Outstanding Gaming Currency or are integral members of the Customer Programs. Each of these patrons are of such critical importance to the Debtor that dishonoring Outstanding Gaming Currency or cessation of the Customer Programs will certainly endanger any meaningful attempt at reorganization and substantially harm all creditors.

23.    Finally, the Debtor is required under Nevada law to honor the Outstanding Gaming Currency and could lose its gaming license if it does not honor the Outstanding Gaming Currency. See, e.g. NRS 463. NRS 463.0129(b) for example, reads, the "continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming and the manufacture, sale and distribution of gaming devices and associated equipment are conducted honestly and competitively, that establishments which hold restricted and nonrestricted licenses where gaming is conducted and where gambling devices are operated do not unduly impact the quality of life enjoyed by residents of the surrounding neighborhoods, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements. Moreover, NRS 463.150(1)(i) grants the Nevada Gaming Commission the authority to adopt regulations, "[p]rescribing under what conditions the nonpayment of a gambling debt by a licensee shall be deemed grounds for revocation or suspension of the licensee's license." Nevada Gaming Commission Regulation 12.060(2)(c), in turn,  states that a licensee that uses chips or tokens at its gaming establishment shall, "[p]romptly redeem its own chips and tokens from its patrons by cash or check drawn on account of the licensee." Moreover, Nevada Gaming Commission Regulation 12.070 states, "A licensee that permanently removes from use or

4826-8429-8330, v. 4

replaces approved chips or tokens at its gaming establishment, or that ceases operating its gaming establishment whether because of closure or sale of the establishment or any other reason, must prepare a plan for redeeming discontinued chips and tokens that remain outstanding at the time of discontinuance. The licensee must submit the plan in writing to the chairman not later than 30 days before the proposed removal, replacement, sale, or closure, unless the closure or other cause for discontinuance of the chips or tokens cannot reasonably be anticipated, in which event the licensee must submit the plan as soon as reasonably practicable." Finally, Nevada Gaming Commission Regulation 5.030 provides, "Violation of any provision of the Nevada Gaming Control Act or of these regulations by a licensee, his agent or employee shall be deemed contrary to the public health, safety, morals, good order and general welfare of the inhabitants of the State of Nevada and grounds for suspension or revocation of a license."

///

///

///

///

///

///

///

///

///

///

///

///

4826-8429-8330, v. 4

WHEREFORE, the Debtor respectfully requests that this Court enter an Order, in the form or order attached hereto as **Exhibit A**: (i) granting the relief requested in this Motion, and (ii) granting such other and further relief that the Court deems just and proper.

DATED this 16th day of February, 2018.

Respectfully Submitted,

/s/ Samuel A. Schwartz
Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
Connor H. Shea, Esq.
Nevada Bar No. 14616
Schwartz Flansburg PLLC
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
*Proposed Attorneys for the Debtor*

4826-8429-8330, v. 4