Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
Connor H. Shea, Esq.
Nevada Bar No. 14616
Schwartz Flansburg PLLC
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741
*Proposed Attorneys for the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re: | Case No.: 18-10792-LED |
| Lucky Dragon Hotel & Casino, LLC, | Chapter 11 |
| Debtor. | |

STATE OF NEVADA   )
                  )  ss:
COUNTY OF CLARK   )

**DECLARATION OF BING O'PEEK IN SUPPORT**
**OF BANKRUPTCY FILING AND FIRST DAY MOTIONS**

Bing O'Peek, the Vice President of Finance for Lucky Dragon Hotel & Casino, LLC, being duly sworn, deposes and says:

1. I am over the age of 18, mentally competent and make this declaration in support of the voluntary Chapter 11 bankruptcy filing of Lucky Dragon Hotel & Casino, LLC (the "**Debtor**"). I make this Declaration upon information and belief and to the best of my knowledge, based upon my personal review of the Debtor's books and records, or as material was provided to me by the Debtor's employees and staff.

2. On February 16, 2018 (the "**Petition Date**"), the Debtor filed its voluntary petition in this Court for reorganization relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "**Bankruptcy Code**").

3. The Lucky Dragon Hotel & Casino is the first casino resort in Las Vegas designed from the ground up to create an authentic Asian cultural and gaming experience. Opened in November 2016, the casino property originally opened with: (i) a 27,500 square foot, two-level casino; (ii) 37 gaming tables and 287 slot machines; (iii) 203 hotel rooms, including 14 suites and a penthouse; (iv) 4 Asian inspired restaurants; (v) 3 bars and lounges; and (vi) a first class spa (collectively, the "**Resort**"). Currently, the enterprise employs 98 people and is primarily operating only the hotel and limited food and beverage service; however, when fully operating, it is projected the Resort will employ 475 people.

4. The Lucky Dragon anticipates that once its operation is stabilized through either the reorganization or sale of the Property, it will be profitable by capitalizing on the underserved Asian gaming community and customers, as well as the growth of the local market on the North Strip. The Debtor's initial core customers consisted of the local Las Vegas Asian and non-Asian market, the regional Asian population, including Los Angeles and San Francisco, and the International Asian visitor, including travelers from Mainland China, Taiwan and Canada. Indeed, nearly 5 million Asian Americans live in California alone, and 200,000 more live in Las Vegas. The Debtor anticipates that with a proper marketing budget and the sufficient stabilization of its operations, coupled with the growth of and development of the North Strip corridor, including the expansion of the Las Vegas Convention Center, the Resort will flourish, particularly in the local Las Vegas market.

5. The Lucky Dragon Hotel and Casino primarily consists of 2 entities. Lucky Dragon, LP, which owns the real estate and improvements at 300 West Sahara Avenue, Las Vegas, Nevada

(the "**Property**"), and employs 68 full time and 30 part-time people. The gaming, hotel and resort operations are then owned and controlled by the Debtor, the Lucky Dragon Hotel and Casino, LLC, which also leases the 98 employees from Lucky Dragon, LP. The capital structure between the companies includes approximately 179 individuals who invested $500,000 each, or $89,500,000 in Lucky Dragon, LP, through the Immigrant Investor Program, or what is commonly referred to as EB-5 investments.[1] In addition, the enterprise is encumbered by 2 loans from Snow Covered Capital, LLC ("**Snow Covered**"), including an initial $30,000,000 construction loan facility, as well as a $15,000,000 revolving loan (collectively, the "**Snow Covered Loans**"). The Loans, in turn, are secured by a deed of trust dated May 3, 2016, and recorded against the Property. As of the date hereof, Lucky Dragon Holdings owes Snow Covered approximately $48,877,969.15.

6. On September 1, 2017, Snow Covered recorded a Notice of Default with the Clark County Recorder, starting the foreclosure process with respect to the Property. As of the Petition Date, a foreclosure sale is set for February 22, 2018. In order to reorganize, preserve 98 jobs, facilitate the orderly payoff of Snow Covered, and the goodwill of the Resort, the Debtor filed its Chapter 11 case. Looking forward, the Debtor anticipates a quick auction, which will pay Snow Covered in full, provide fresh capital, and reenergize the project such that it can become profitable and expand into full operation as quickly as possible.

7. Indeed, the Debtor filed its case in good faith, to preserve jobs, pay its creditors and provide certainty to the market with respect to the Property and the Resort. In order to facilitate its quick emergence from bankruptcy, the Debtor retained Spectrum Gaming Capital ("**SGC**") as its

---

[1] An EB-5 visa is an opportunity for qualified foreign investors to obtain a Green Card for themselves or their families through the Immigrant Investor Program, which was established by Congress in 1992. The EB-5 program authorized the U.S. Citizenship and Immigration Services to grant Green Cards to foreign investors who help create or save jobs for U.S. citizens. In this case, the Debtor and Lucky Dragon, LP qualified for the EB-5 program.

4843-6998-5883, v. 1

financial advisor. Prior to the filing, the Debtor, through SGC, started actively showing the Property and the Resort to interested parties, many of whom expressed serious interest in the assets and in amounts that would pay Snow Covered in full. Therefore, the Debtor anticipates running a quick, but thoughtful auction of the Property and Resort, so that not only are Snow Covered's secured claims protected, but unsecured creditors are also given an opportunity to recover for their claims, and EB-5 investors are given an opportunity to preserve their investments, to the extent each are possible. Accordingly, the Debtor believes a Chapter 11 sale process in this case is the best opportunity for all interested parties to preserve and maximize the value of the Property and the Resort.

8. On February 16, 2018, and February 20, 2018, the Debtor filed the following first day motions and applications for its Chapter 11 case:

a. Motion for the Entry of an Order under sections 363, 364, 1107 and 1108 of title 11 of the Bankruptcy Code Authorizing the Debtor to (i) Maintain Existing Bank Accounts; (ii) Continue to Use its Existing Business Forms; (iii) Continue to Use Its Existing Cash Management System; and (iv) Continue Using Existing Investment Practices (the "**Bank Accounts Motion**");

b. Motion for an Order (i) prohibiting the Debtor's utility service providers from altering, refusing, or discontinuing services, and (ii) establishing procedures for determining requests by the utility service providers for additional adequate assurance of payment (the "**Utilities Motion**");

c. Motion pursuant to sections 105, 361, 362, 363, 364, 1107 and 1108 of title 11 of the Bankruptcy Code and Rules 4001(b), 6003 and 6004 of the Federal Rules of Bankruptcy Procedure for entry of an order (a)(i) authorizing the Debtor's use of cash, which may comprise cash collateral, (ii) finding that the interests of any purportedly secured party are adequately protected, and (iii) granting related relief or (b) alternatively, authorizing the Debtor to surcharge the prepetition collateral (the "**Cash Collateral Motion**");

      d.  Motion for the Entry of an Order Authorizing, But Not Directing, the Debtor to (i) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (ii) Pay and Honor Employee Medical and Other Benefits, and (iii) Continue Employee Wages and Benefits Programs (the "**Employee Wages Motion**");

      e.  Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 1107(a) and 1108 Authorizing, but Not Directing the Debtor to Honor Certain Prepetition Obligations and Maintain Customer Programs (the "**Customer Programs Motion**");

      f.  Motion for the Entry of an Order to Extend the Automatic Stay Pursuant to Sections 105(a) and 362(a) to Lucky Dragon Holdings, LP (the "**Motion to Extend the Automatic Stay**"); and

      g.  Motion for the Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b) (I) the Debtor to Pay, and Establishing Procedures for Treatment of, Claims Arising under the Perishable Agricultural Commodities Act of 1930 and the Packers and Stockyards Act of 1921; and (II) Authorizing and Directing Financial Institutions to Honor, Process and Pay All Payments Related Thereto (the "**PACA/PASA Motion**").

**Bank Account Motion**

9. At the time of the bankruptcy filing, the Debtor maintains five (5) bank accounts with Bank of Nevada, including a general account, disbursement account and merchant account. These accounts are used to manage cash, receipts and disbursements for the business. The Debtor routinely deposits, withdraws, and otherwise transfers funds to and from this bank account. Importantly, the Debtor's merchant process servers routinely deposit funds from into these bank accounts. These bank accounts are essential to the continued operation of the Debtor's business.

10. Importantly, prior to filing, the Debtor was subject to an audit from the Nevada Gaming Control Board (the "**GCB**"). On January 3, 2018, the GCB gave the Debtor a list of violations and 30

days to respond. Subsequently, the Debtor ceased its gaming operations, and the GCB is now performing a more comprehensive audit postpetition, which includes a review of the Debtor's bank accounts. Accordingly, designating these bank accounts as debtor-in-possession accounts is in the best interests of a smooth transition into Chapter 11.

**Utilities Motion**

11. The Debtor's utilities consist of accounts with Nevada Energy, Republic Services, Centurylink, Southwest Gas and the Las Vegas Valley Water District, which are needed to provide power, water, gas, phone, internet and cable TV service to the Debtor's business.

12. Power, gas, water, telephone, cable, and internet facilities must be provided to the Debtor's business offices in order for the Debtor to continue operating its business and providing customer service to its clients. At this time, the Debtor cannot afford the risk of utility providers terminating utility services to any of the Debtor's business offices. The Utilities Motion requests an order of this Court (i) prohibiting the various utility providers from altering, refusing or discontinuing services or requiring additional deposits or other security on account of the commencement of the Debtor's Chapter 11 Case or any pre-petition claims, (ii) establishing procedures for determining requests for additional adequate assurance of payment, and (iii) granting such other and further relief as is just and proper.

**Cash Collateral Motion**

13. As stated in the Cash Collateral Motion, the Debtor derives practically all of its income from the revenues it receives from its hotel and restaurant business. The Debtor depends on the revenues, in part, to maintain its business operations, including the payment of expenses for payroll, utilities and vendors.

4843-6998-5883, v. 1

14. Without the ability to use the business revenues, the Debtor will be unable to maintain the business operations, including the payment of all necessary expenses. Moreover, the failure to pay the aforementioned expenses will result in an inability to maintain the income stream generated from the Debtor's business operations.

15. As Vice President of Finance of the Debtor, I assisted in the preparation of the budget attached to the Cash Collateral Motion, which is a good faith estimate of projected income and expenses of the Debtor for the next 90 days. The Debtor will maintain a detailed accounting of all expenses funded by the revenue generated by its business operations.

**Employee Wages Motion**

16. As of the Petition Date, the Debtor employs 68 full-time and 30 part-time employees (collectively, the "**Employees**"). The Debtor seeks court authority to pay and honor, in the ordinary course of business, any pre-petition claims and obligations related to, and to continue to pay and honor in the ordinary course on a post-petition basis, all of the Employee wages and benefits (as defined in the Employee Wages Motion) in an amount not to exceed $195,000.00.

17. The Debtor pays each of its employees on a bi-weekly basis, with the next payroll due on February 2, 2018.

18. The Debtor believes that all Employee wages and benefits are vital to the Debtor's business, and seeks authority to maintain and make payments to the Employees in order to prevent immediate and irreparable harm to the Debtor's business. The Debtor believes if the Employees are not paid, they will not continue working for the Debtor.

19. The pre-petition payments to Employees sought by the Employee Wages Motion do not include any payments to insiders. The Debtor's insiders are not on the company's payroll and no payments are slated for them in the Motion.

4843-6998-5883, v. 1

20. As of today, I do believe the Debtor has any amounts owed to employees in excess of the regular payroll outlined in the Employee Wages Motion.

**Customer Programs Motion**

21. In the ordinary course of operating its hotel and casino business, the Debtor routinely issues slot vouchers and gaming chips to of various denominations in order to facilitate its customer's ability to place wagers on the casino floor. The Debtor surmises that many Lucky Dragon patrons currently possess gaming currency issued by the Debtor (the "**Outstanding Gaming Currency**"). The Debtor estimates that the Outstanding Gaming Currency is less than $50,000.

22. Additionally, the Debtor offers several promotional offerings to its customers, including rewards clubs and loyalty programs (the "**Customer Programs**") which cater to Lucky Dragon customers. Through operation of these Customer Programs, Lucky Dragon patrons can earn discounted hotel rooms, parking upgrades, VIP passes to events, and rewards points for use within the hotel and casino. The Customer Programs are critical to the Debtor's business, particularly, they promote brand loyalty, enhance the customer experience at the Lucky Dragon, and help generate the revenue stream with which the Debtor relies upon to operate. The Debtor estimates this number is under $5,000.

23. The Debtor considers the holders of the Outstanding Gaming Currency and the continuation of their Customer Programs critical to their operations. The Debtor operates in a highly competitive environment, where customer satisfaction and the ability to maintain repeat business though exceptional customer service are of critical importance. Finally, I believe the Debtor is required under Nevada law to honor the Outstanding Gaming Currency and could lose its gaming license if it does not honor the Outstanding Gaming Currency.

**Motion to Extend the Automatic Stay**

24. The Debtor's resort hotel and casino operations are its most significant assets, around which it intends to reorganize. The Debtor's ability to consummate any restructuring depends almost entirely on the ability of the Debtor to generate income through operation of the Resort, as well as a sale of the enterprise. If the Property is sold through a trustee's sale, the Debtor's creditors will be harmed.

25. Indeed, if the Property is sold, the Debtor's to possess the Property will be extinguished, thereby causing the Debtor to cease its hotel and restaurant operations at the Property. This, in turn, will cause the Debtor's Chapter 11 case to fail. Accordingly, the Debtor requests the automatic stay be extended to Lucky Dragon Holdings and any debt owed to Snow Covered Capital during the pendency of the Debtor's Chapter 11 case.

**PACA/PASA Motion**

26. In the ordinary course of the Debtor's business, the Debtor purchases a variety of consumable goods essential for the Debtor's restaurant's operation. In many instances, the consumable goods received daily by the Debtor are used in the preparation of the various menu items to be served later that same day. These consumable goods include among other things, beef, poultry, dairy products, produce and general merchandise purchased from a diverse range of vendors, including agricultural growers. The Debtor's purchase of certain of these consumable goods may be subject to the requirements of the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a *et seq*. ("**PACA**") and/or the Packers and Stockyards Act of 1921 as amended, 7 U.S.C. §§ 181 *et seq*. ("**PASA**"). As a result, the Debtor anticipates that a significant number of its vendors may file notices to preserve and assert claims under PACA/PASA.

4843-6998-5883, v. 1

27. It is imperative that the Debtor establish procedures for the orderly reconciliation and disposition of PACA Claims to ensure that the supply of fresh produce and related products continues unimpeded. As such, the Debtor proposes that the Court approve the procedures described in the PACA/PASA Motion, which are designed to allow the Debtor to reconcile and to pay PACA claims arising prior to the Petition Date in an orderly and efficient manner.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 20th day of February, 2018.

/s/ Bing O'Peek
    Bing O'Peek

4843-6998-5883, v. 1