E-filed: **February 20, 2018**

Bob L. Olson (NV Bar No. 3783)
Nathan G. Kanute (NV Bar No. 12413)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
Email: bolson@swlaw.com
       nkanute@swlaw.com
*Attorneys for Snow Covered Capital, LLC*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>LUCKY DRAGON HOTEL & CASINO, LLC,<br><br>　　　　　　Debtor. | Case No. 18-10792-led<br><br>Chapter 11<br><br>**OPPOSITION TO DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 1107 AND 1108 AND RULES 4001(b), 6003 AND 6004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR ENTRY OF AN ORDER (A)(I) AUTHORIZING THE USE OF CASH, INCLUDING CASH COLLATERAL, (II) FINDING THAT THE INTERESTS OF THE PREPETITION LENDER AND ANY OTHER PURPORTEDLY SECURED PARTY ARE ADEQUATELY PROTECTED, AND (III) GRANTING RELATED RELIEF, OR (B) ALTERNATIVELY, AUTHORIZING THE DEBTOR TO SURCHARGE THE PREPETITION COLLATERAL**<br><br>**AND**<br><br>**MOTION TO STRIKE DECLARATION**<br><br>**Hearing Date:** February 21, 2018<br><br>**Hearing Time:** 3:00 p.m.<br><br>**Hearing Location:**<br>　　United States Bankruptcy Court<br>　　Foley Federal Building, Courtroom No. 3<br>　　300 Las Vegas Blvd South, Third Floor<br>　　Las Vegas, Nevada 89101 |

4825-0939-3502

Snow Covered Capital, LLC ("SCC") hereby submits this opposition (the "Opposition") to Debtor Lucky Dragon Hotel & Casino, LLC's ("Debtor" or "Lucky Dragon") *Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 1107 and 1108 and Rules 4001(B), 6003 and 6004 of the Federal Rules of Bankruptcy Procedure for Entry of an Order (A)(I) Authorizing the Use of Cash, Including Cash Collateral, (II) Finding that the Interests of the Prepetition Lender and Any Other Purportedly Secured Party are Adequately Protected, and (III) Granting Related Relief, or (B) Alternatively, Authorizing the Debtor to Surcharge the Prepetition Collateral* (the "Cash Collateral Motion") and moves to strike the declarations filed by Debtor in violation of Fed. R. Bankr. P. 9006.

The Cash Collateral Motion is an attempt by Debtor to continue operating its unprofitable business, and pay for expenses of reorganization, on the back of SCC. All the while, Debtor will seek to hold SCC's foreclosure at bay without filing a bankruptcy for Lucky Dragon, LP ("Lucky Dragon Holdings") – the entity that owns the real property securing the obligations to SCC – and not pay one penny to SCC for the use of its collateral. This is evidence of bad faith. Further, Debtor's request for surcharge within minutes of filing its petition is wholly inappropriate. Debtor has not and will not be able to meet the test required for a surcharge.

This Opposition is supported by the following Memorandum of Points and Authorities and the Declarations of Enrique Landa (the "Landa Declaration") and Keith Harper (the "Harper Declaration").

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.   **FACTUAL BACKGROUND**

**A.   The Loan Documents.**

1. Lucky Dragon Holdings owns the real property located at 300 West Sahara Avenue, Las Vegas, Nevada (the "Property") which is used by Debtor to operate the Lucky Dragon Hotel & Casino, which currently has no gaming operations.

2. On or around May 3, 2016, SCC loaned Lucky Dragon Holdings $30,000,000.00 and an additional $15,000,000 on a revolving basis (collectively, the "Loan"), pursuant to that

certain Construction Loan Agreement (the "Loan Agreement"), that certain Secured Promissory Note (Construction Loan) (the "Construction Loan Note"), and that certain Secured Promissory Note (Line of Credit) (the "Line of Credit Note"), each dated on or around May 3, 2016. A true and correct copy of the Loan Agreement is attached to the Landa Declaration as **Exhibit A**. A true and correct copy of the Construction Loan Note is attached to the Landa Declaration as **Exhibit B**. A true and correct copy of the Line of Credit Note is attached to the Landa Declaration as **Exhibit C**. Landa Declaration, ¶ 5.

2. The Loan was secured by, among other things, that certain Construction Deed of Trust (With Assignment of Leases and Rents, Security Agreement and Fixture Filing) (the "Deed of Trust") dated May 3, 2016, encumbering the Property. The Deed of Trust was recorded on May 11, 2016 as Document No. 20160511-0002786. A true and correct copy of the Deed of Trust is attached to the Landa Declaration as **Exhibit D**. Landa Declaration, ¶ 6.

3. The Loan was guaranteed by William Weidner, Andrew Fonfa, and David Jacoby (collectively, the "Guarantors"). A true and correct copy of the guaranties executed by each of the Guarantors (collectively, the "Loan Guaranties") is attached to the Landa Declaration as **Exhibit E**. Landa Declaration, ¶ 7. The Loan Guaranties contain recourse provisions, which, among other things, trigger joint and several liability for the full amount of the "Secured Obligation" if the Property becomes an asset in a voluntary bankruptcy.

4. The Loan Agreement, Construction Loan Note, Line of Credit Note, Deed of Trust, and Loan Guaranties are collectively referred to herein as the "Loan Documents."

**B.  Debtor's License Agreement with Lucky Dragon Holdings.**

6. Nearly three months after entering into the Loan, Debtor and Lucky Dragon Holdings executed a Hotel and Casino License Agreement ("License Agreement"). A true and correct copy of the License Agreement is attached to the Landa Declaration as **Exhibit F**.

7. Pursuant to the License Agreement, Debtor owes nothing to Lucky Dragon Holdings as a license fee until the Debtor has a net cash flow that exceeds all of the following, in the aggregate: (i) $50,000 operation fee to Debtor; (ii) a retention by Debtor for expenses; (iii)

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

4825-0939-3502

payment under an insider note due to Lucky Dragon Holdings; and (iv) payments under any other agreements relating to the hotel and casino where Debtor or Lucky Dragon Holdings are a party to that other agreement. *See* License Agreement, Ex. F, § 5.01.

8. The License Agreement further provides that "Licensee may, upon written notice to Licensor, decrease the License Fee and/or increase the Priority Payment. Licensee may, in its sole and absolute discretion, determine whether to pay the License Fee when due or whether to defer such payment, in which event any amount deferred shall constitute a shortfall that shall accrue and be added to the balance of the Note." *Id.*

C. **Lucky Dragon Holdings' Default Under the Loan Documents.**

9. Lucky Dragon Holdings defaulted under the Loan Documents by, among other things, failing to pay amounts due and owing under the Loan Documents as of August 3, 2017 (collectively, the "Default"). Landa Declaration, ¶ 11.

10. By letter dated August 14, 2017, SCC notified Lucky Dragon Holdings and Guarantors that Lucky Dragon Holdings was in Default under the Loan Documents (the "Default Letter"). The Default Letter demanded that Lucky Dragon Holdings immediately cure the Default. A true and correct copy of the Default Letter is attached to the Landa Declaration as **Exhibit G**. Landa Declaration, ¶ 12.

11. Despite demand, Lucky Dragon Holdings failed to cure the Default.

12. Accordingly, SCC noticed a trustee's sale of the Property for February 6, 2018 (the "Notice of Trustee's Sale"). A true and correct copy of the Notice of Trustee's Sale is attached to the Landa Declaration as **Exhibit H**. Landa Declaration, ¶ 14.

13. As stated in the Notice of Trustee's Sale, the amount due on the Loan as of February 16, 2018, the Petition Date, was $49,632,209.91. Interest continues to accrue, as stated in the Construction Loan Note and Line of Credit Note, at the default rate of 17.5% per annum ("Default Rate of Interest") which is $21,875.00 per diem. Landa Declaration, ¶ 15.

D. **The Property & The Debtor's Operations.**

14. Lucky Dragon Holdings owns the Property—*i.e.*, the land and physical buildings

4825-0939-3502

located on the Property.

15. Upon information and belief, the Debtor leases the Property from Lucky Dragon Holdings.

16. Beginning in November 2016, the Debtor operated casino, hotel, and restaurant businesses on the Property.

17. On or about, January 4, 2018, the Debtor closed the casino and all but one restaurant it had operated on the Property. The Debtor continues to operate the hotel on the Property.

18. As a result of the Debtor's closing of the casino and restaurants, the Debtor is generating insufficient revenues to pay its normal operating expenses.

19. On or about February 8, 2018, SCC obtained an appraisal report of the Property (the "Appraisal Report"). The Appraisal Report states that, as of January 31, 2018, the "As Is" market value of the going concern was $60 Million. A true and correct copy of the Appraisal Report is attached to the Harper Declaration as **Exhibit I**. Harper Appraisal, ¶ 5.

E. **The Bankruptcy Case.**

20. On February 16, 2018 (the "Petition Date"), the Debtor filed a chapter 11 petition for relief, initiating this bankruptcy case (the "Bankruptcy Case").

21. On February 16, 2018, the Debtor filed the Cash Collateral Motion. The Debtor asserts, among other things, that SCC is adequately protected by the Debtor's continued operation of its businesses, an equity cushion in the Property, and the grant of replacement liens.

## II. LEGAL ARGUMENT

A. **Debtor Proposes to Use SCC's Collateral to Fund its Bankruptcy.**

As set forth above, SCC has a perfected security interest in the Property owned by Lucky Dragon Holdings. That security interest includes an assignment of Lucky Dragon Holdings' Leases and Rents, as defined in the Deed of Trust. *See* Exhibit D, at 2 and 16-20. Those Leases and Rents would include any amount due from Debtor to Lucky Dragon Holdings. Therefore, those amounts would constitute SCC's collateral and, where Debtor proposes to keep those assets

- 5 -

4825-0939-3502

in this estate and use them to the exclusion of SCC, would constitute "cash collateral" within the meaning of § 363(a).

Debtor and Lucky Dragon Holdings' License Agreement, however, likely removes any claims by Lucky Dragon Holdings to rents from Debtor. As set forth above, the License Agreement only provides for a license fee where Debtor's net cash flow is greater than amounts required for operation, a $50,000 monthly operating fee for Debtor, and payments due on an insider loan. This arrangement will likely allow Debtor to argue that, in effect, there is no cash collateral or any security interest in payments due from Debtor to Lucky Dragon Holdings. This is made all the more likely because the License Agreement explicitly allows Debtor to decrease or simply stop paying the license fee. *See* License Agreement, Ex. F, § 5.01. This arrangement, however, cannot be permitted to continue while Debtor uses the Property during its bankruptcy.

Debtor here proposes to keep and use all of its purported operating income not only to fund operations, but to pay for administrative expenses of its Chapter 11 proceeding. *See* Cash Collateral Motion, Exhibit A (proposing to pay $40,000 monthly for Chapter 11 administrative and legal expenses). This is despite the fact that Debtor proposes to (i) continue using the Property to the exclusion of SCC, and (ii) pay nothing to SCC or Lucky Dragon Holdings during the pendency of its bankruptcy in violation of 11 U.S.C. 365(d)(3). The administrative and legal fees of Debtor cannot be paid during the course of this Chapter 11 where SCC is not being paid. This would amount to SCC's collateral funding Debtor's reorganization. The administrative claimants must get in line with Debtor's other creditors. They should only be paid upon a successful reorganization or a liquidation, and then only to the extent there are sufficient assets to pay pursuant to the priorities of § 507. Debtor must, however, propose to pay SCC something for the continued use of its collateral. Since it makes no such proposal, nor could it afford to, based on Debtor's projected budget, a reorganization of Debtor is unlikely and use of cash collateral should be denied or drastically limited.

**B.     SCC is not Adequately Protected.**

Section 363 of the Bankruptcy Code prohibits the use of cash collateral by a debtor-in-

- 6 -

4825-0939-3502

possession without the consent of either the creditor with an interest in such collateral or court authorization. 11 U.S.C. § 363(c)(2). SCC does not consent to Debtor's proposed use of cash collateral. Absent consent, Debtor may only use the SCC's cash collateral upon Court approval and upon compliance with the requirements of Title 11. Pursuant to 11 U.S.C. §§ 361 and 363, the Court cannot approve Debtor's proposed use of SCC's cash collateral, over SCC's objection, unless Debtor demonstrates that SCC is adequately protected by such use. *See In re Scottsdale Medical Pavilion*, 159 B.R. 295, 302 (9th Cir. BAP 1993) ("in all cases the debtor must provide adequate protection of the creditor's interest as a condition of using cash collateral"). The requirement of adequate protection is mandatory. *See Freightliner Market Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 367 (9th Cir. 1987). Debtor has the burden of proof on this issue. *See* 11 U.S.C. § 363(p)(1).

1. **Debtor is not Offering Adequate Protection.**

The two most common forms of adequate protection, aside from an equity cushion, are periodic payments and replacement liens. Debtor is not offering SCC any post-petition payments. Lucky Dragon Holdings is also not making any payments to SCC and has not done so since before August 2017. If Debtor wishes to continue operating on the Property, it must be required to pay SCC the monthly payments due on the Construction Loan Note and Line of Credit Note.

The Cash Collateral Motion does purport to offer SCC replacement liens in Debtor's post-petition assets. However, that offer is largely illusory. Debtor claims that it will generate sufficient net income to have positive cash flows to which a security interest could attach. When the Debtor's projections are scrutinized, though, it is clear that this Debtor will be operating at a loss. As set forth in Exhibit A to the Cash Collateral Motion, Debtor is projecting a net income of $190.00 for three months' of operations. The positive value of the net income is completely dependent on the Debtor receiving $800,000 in "other revenue." The Debtor never explains why its operations, which now only include a hotel and one restaurant, would have "other revenue" that is only marginally lower than all of its other operating revenue. Given the dramatically decreasing amount of "other revenue" shown on Exhibit A, it would be reasonable for the Court

to determine that this revenue line item is overly optimistic. If the Court estimated this "other revenue" at $150,000 per month – the amount Debtor projects for this line item in April 2018 – and presuming the $120,000 in Chapter 11 administrative and legal expenses is removed, Debtor's net income is -$229,810 for the three month period. Accordingly, there will be nothing of any value for a post-petition lien to attach to.

2.  **The Equity Cushion is not Adequate Protection**

    (a)  The Court should Strike the Debtor's Appraisal.

The Debtors have submitted an appraisal dated November 8, 2017, prepared for Silver Arch Capital Partners. *See* Cash Collateral Motion, Exhibit B. The appraisal was not prepared for use in this case or delivered to Debtor. Indeed, the first page of the coversheet of the appraisal states that:

> The intended use of this report is solely for mortgage financing purposes and no other use. The intended user(s) of this report are Silver Arch Capital Partners, LLC. This report may be used and relied upon only by Silver Arch Capital Partners, LLC, and no other party is permitted to use or rely on the report. . . . The report is not intended to be distributed to any other third parties nor be used for other financing or investment purposes without Newmark Knight Frank Valuation & Advisory's written permission.

The appraisal appears to have been misappropriated by the Debtor. Accordingly, it cannot be used here.

Moreover, the appraisal is unauthenticated hearsay and must be stricken. See FRE 802. The Debtor is offering the appraisal for the truth of the matter asserted, but it consist solely of out of court statements made by the appraiser. There is no exception to the hearsay rule into which this appraisal can fall. Accordingly, it cannot be relied upon.

    (b)  Even if the Appraisal was Considered, its Valuation must be Ignored.

Even if the Court were to determine that it would consider Debtor's offered appraisal, the valuation conclusion asserted therein cannot be relied upon. As Debtor has admitted, its best case scenario for net income over the next three months is $120,190 (adding back in the inappropriate attempt to spend $120,000 on Chapter 11 administrative and legal fees). Annualized, this equals

- 8 -

4825-0939-3502

$480,760 in net income. To get anywhere near the valuation in the appraisal on an income capitalization approach, the cap rate would have to be an unreal 0.34%. Since the market comparison approach also used a multiplier of EBITDA to arrive at its valuation, after comparing sales of operating casino properties going back 20 years, that valuation cannot be trusted. The EBITDA used made assumptions that are not borne out by Debtor's admissions related to its operations. In fact, if Debtor's projections were used, an EBITDA multiplier of nearly 300 would have to be used to arrive at the valuation on the appraisal. Finally, the cost approach estimated insurable value of the Property, but admitted that "[a]s real estate appraisers, we are not professionally qualified to render an estimate of Insurable Replacement Costs pertaining to the real estate we analyze for valuation purposes. As such, this document should be relied upon only as an estimate of replacement cost." Cash Collateral Motion, Exhibit B at 54. Therefore, the cost approach valuation cannot be relied upon. Without this purported valuation, Debtor cannot establish an equity cushion.

Debtor will no doubt claim that its equity conclusion will be established by the presentation of one or more buyers for the Property and Debtor's operations. Debtor's Motion even talks about a quick sale. The Debtor provides no evidence to the Court about how the Property and operations are being marketed and has not sought to put in place procedures for this sale that has yet to materialize. Little value should be given to Debtor's claim of a sale until something concrete is presented to the Court.

(c)     Any Equity Cushion is being Eroded.

SCC does believe that there is currently an equity cushion of roughly $10,000,000. *See* Harper Declaration, Ex. I. However, interest continues to accrue on the Loan at the rate of $21,875.00 per day. Landa Declaration, ¶ 15-16. If the Debtor is seeking to sell the Property and gaming approval is required for any sale, this equity cushion will likely be gone before such approval is obtained. That is the case presuming no erosion in the value of the Property.

However, the Court cannot presume that the value of the Property will not decrease during these proceedings. Debtor admits that it is not currently operating to the full potential of the

- 9 -

Property. Despite all of its potential, Debtor's revenues only allow for operation of the hotel and "limited food and beverage service." Cash Collateral Motion, p. 2, ¶ 4. As this Court is well aware, there are a lot of options in Las Vegas for tourists and locals to spend their money. A property that is operating solely as a hotel with limited amenities is not high on the list of options, especially where that property is not within close proximity to all of the amenities a Las Vegas visitor expects. The longer Debtor continues to operate at its limited capacity, the more that word of mouth will spread regarding the limited service. This is particularly true in the age of online travel booking and reviews. The decreasing revenue that will result will quickly devalue Debtor's assets and Lucky Dragon Holdings' assets right along with them.

C. **Debtor Cannot Prove the Elements Required For A Surcharge.**

Debtor is seeking a surcharge against SCC related to property Debtor does not even own. Debtor has not provided this Court with any authority suggesting a trustee may surcharge an entity with a lien against property the Debtor does not even own.

Assuming that a trustee or debtor in possession may surcharge an entity with a lien against property the Debtor does not even own, Debtor cannot establish that it is entitled to a surcharge. In order to surcharge a creditor, "the party seeking the surcharge must prove that its expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor." *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001). This burden is "an onerous burden of proof" and any resulting surcharge is limited to the amount of the benefit which must be proven with specificity. *Id.* As stated by one court:

> In order to prevail on its claim against the holder of the secured claim, the trustee has the burden to establish that the costs and expenses were necessary to the preservation and disposition of the property, that they were reasonable and that they directly benefited the holder of the claim….
>
> It is the trustee's burden to show that a benefit to the creditor was directly attributable to his act as well as quantifying that benefit…. The cost must result in a direct primary benefit to the creditor; expenses which result in improvement in the position of the debtor but only indirectly benefit the creditor are not recoverable…. Thus, recovery is not permitted where the benefit derived from the

- 10 -

4825-0939-3502

>actions of the trustee could have been obtained in the absence of his acts....

*In re Iberica Manufacturing*, 180 B.R. 707, 712-13 (Bankr. D. Puerto Rico 1995). Thus, there must be a benefit to the secured creditor before there can be a surcharge. *In re North County Place, Ltd.*, 92 B.R. 437, 445 (Bankr. C.D. Cal. 1988). This burden of proof is intensely fact determinative which requires both a subjective and an objective assessment of the applicant's actions. *In re Cann & Saul Steel Co.*, 86 B.R. 413, 414 (Bankr. E.D. Pa. 1988).

It is well established that possible and/or hypothetical benefits do not suffice. *In re Pullman Construction Industries, Inc.*, 107 B.R. 909, 941 (Bankr. N.D. Ill. 1989). Furthermore, an allowance of a § 506(c) surcharge is not allowable if that surcharge would cost more than what the secured creditors could have paid to obtain the same results. *See In re Crutcher Concrete Construction*, 218 B.R. 376, 81 (Bankr. W.D. Ky. 1998) (holding that the trustee failed to prove that the secured creditor received "anything over and above that which it could have received without the trustee's intervention").

As is clearly shown by the cases cited above, the entire analysis required for the Court to grant a surcharge is backward looking. There is no way for a Court to determine whether services that have yet to be performed are "reasonable" or "necessary." Further, and perhaps more importantly, there is no way to assess the actual quantifiable benefit to SCC from actions that have not yet been taken. Debtor is required to present evidence of the amount of the benefit to the secured creditor and how much that benefit exceeded what the secured creditor could have otherwise obtained for itself. Only after such a showing may a surcharge be granted and only up to the amount of the benefit. *In re Cascade Hydraulics and Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987). A preemptive grant of a surcharge or carve-out would be a blank check to pursue any and every means to try and obtain any recovery, no matter how small. Therefore, the request to surcharge SCC's collateral must be denied.

D. **Debtor's Bankruptcy was Filed in Bad Faith.**

As set out above, Debtor wants to use the Property without having to pay to do so. Debtor is also counting on the benefit of the automatic stay applying to the Property, but the principals of

- 11 -

4825-0939-3502

Debtor and Lucky Dragon Holdings refuse to allow Lucky Dragon Holdings to file for bankruptcy. The most likely reason that Debtor filed for bankruptcy and is seeking to profit from and otherwise deal with the Property, which it does not own, is to avoid filing for Lucky Dragon Holdings and exposing the Guarantors to liability to SCC for violating the terms of the Recourse Obligations Guaranty. *See* Exhibit E.

Generally the Recourse Obligations Guaranty makes the Guarantors liable to SCC for: (1) "all legal costs and expenses (including reasonable attorney's fees) reasonably incurred by Lender (i) in connection with litigation or other legal proceeding involving the collection or enforcement of this Guaranty, and (ii) arising from or relating to the filing of a petition under any bankruptcy, reorganization, insolvency, readjustment of debt, rearrangement, dissolution, liquidation or other similar debtor relief law or statute by or against Borrower or any Guarantor;" and (2) Guarantors are "liable jointly and severally liable for the full amount of the Secured Obligation in the event that: (i) the Premises or any part thereof becomes and asset in a voluntary bankruptcy or voluntary insolvency proceeding under the U.S. Bankruptcy Code, or in an involuntary bankruptcy or involuntary insolvency proceeding brought by any Guarantor or an affiliate of Borrower or Guarantors, or in an involuntary bankruptcy or involuntary insolvency proceeding in which Borrower, any Guarantor or an affiliate of Borrower or any Guarantor has assisted, colluded with or conspired with the Person bringing such action."

This Court should not give Debtor the power to keep the Property out of the reach of SCC. This is particularly true where Debtor seeks to benefit from the use of the Property to generate revenue and pay expenses without any payment to SCC. Allowing this scheme to continue would condone the self-interest actions of the Guarantors who are merely seeking to avoid triggering the Recourse Obligations Guaranty. Putting Debtor into bankruptcy to take actions detrimental to creditors of Lucky Dragon Holdings, especially SCC, while avoiding personal liability is clearly an act of bad faith.

E. **The Late-Filed Declarations Should be Stricken**

Fed. R. Bankr. P. 9006(d) provides that "[w]hen a motion is supported by affidavit, the

4825-0939-3502

affidavit *shall* be served with the motion." After 9:00 a.m. today – less than three hours before this Opposition was due and four days after the Debtor filed its first day motions, including the Cash Collateral Motion – Debtor finally filed declarations of Bing O'Peek [ECF No. 31] and Robert Heller [ECF No. 33] to support those motions. This delay was clearly designed to disadvantage any party, including SCC, who wished to oppose the motion. Such gamesmanship cannot be permitted. Given the violation of Fed. R. Bankr. P. 9006(d), the declarations should be stricken.

### III. CONCLUSION

For the foregoing reasons, SCC respectfully requests that the Court deny Debtor's Cash Collateral Motion. Alternatively, SCC requests that the Court require Debtor to pay SCC monthly payments equal to the monthly payments due from Lucky Dragon Holdings to SCC under the relevant Loan Documents.

DATED this 20th day of February 2018.

SNELL & WILMER L.L.P.

By: /s/ Bob L. Olson
Bob L. Olson (NV Bar No. 3783)
Nathan G. Kanute (NV Bar No. 12413)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
*Attorneys for Snow Covered Capital, LLC*

- 13 -

4825-0939-3502