Samuel A. Schwartz, Esq.
Nevada Bar No. 10985
Bryan A. Lindsey, Esq.
Nevada Bar No. 10662
Connor H. Shea, Esq.
Nevada Bar No. 14616
Schwartz Flansburg, PLLC
6623 Las Vegas Blvd. South, Suite 300
Las Vegas, Nevada 89119
Telephone: (702) 385-5544
Facsimile: (702) 385-2741
Attorneys for the Debtors

## UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| In re: | ) | Lead Case No. 18-10792-LEB |
| | ) | |
| Lucky Dragon Hotel & Casino, LLC, | ) | Joint Administration with: |
| | ) | Case No.: 18-10850-LEB |
| Debtor, | ) | |
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | Hearing Date: |
| Lucky Dragon, LP, | ) | Hearing Time: |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**DISCLOSURE STATEMENT FOR THE CHAPTER 11**
**PLAN OF REORGANIZATION OF LUCKY DRAGON HOTEL & CASINO, LLC**
**AND LUCKY DRAGON, LP UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

THE VOTING DEADLINE IS 5:00 P.M. PREVAILING PACIFIC TIME ON _____, 2018 (UNLESS THE DEBTORS EXTEND THE VOTING DEADLINE).

TO BE COUNTED AS A VOTE TO ACCEPT OR REJECT THE PLAN, THE DEBTORS' COUNSEL, SCHWARTZ FLANSBURG, PLLC, 6623 LAS VEGAS BOULEVARD SOUTH, SUITE 300, LAS VEGAS, NEVADA, 89119, ATTN: SAMUEL A. SCHWARTZ, ESQ. MUST ACTUALLY RECEIVE YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

---

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS HIGHLY SPECULATIVE, AND SUCH DOCUMENTS SHOULD NOT BE RELIED UPON IN MAKING INVESTMENT DECISIONS WITH RESPECT TO THE DEBTORS OR ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THIS CHAPTER 11 CASE.

---

PRESERVATION OF AVOIDANCE ACTIONS UNDER THE PLAN:

IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN, AND IN DETERMINING WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, CREDITORS AND INTEREST HOLDERS (INCLUDING PARTIES THAT RECEIVED PAYMENTS FROM THE DEBTORS WITHIN NINETY (90) DAYS PRIOR TO THE PETITION DATE) SHOULD CONSIDER THAT A CAUSE OF ACTION MAY EXIST AGAINST THEM, THAT THE PLAN PRESERVES ALL CAUSES OF ACTION AND THAT THE PLAN AUTHORIZES THE REORGANIZED DEBTORS TO PROSECUTE THE SAME.

---

IMPORTANT INFORMATION FOR YOU TO READ

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION OF LUCKY DRAGON HOTEL & CASINO, LLC AND LUCKY DRAGON, LP UNDER CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN FOR THE PURPOSE OF SOLICITING VOTES TO ACCEPT THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.  THE LIQUIDATION ANALYSIS, DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO

BE ACCURATE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED TO CREDITORS WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, AND WILL INSTEAD RELY UPON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY SECURITIES PURSUANT TO THE PLAN CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE SECURITIES LAWS GOVERNING THE TRANSFERABILITY OF ANY SUCH SECURITIES.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN EQUITY INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, HOLDERS OF CLAIMS AND EQUITY INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THIS DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTORS OR THE REORGANIZED DEBTORS MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.  ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS' MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE

BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE DEBTORS ARE GENERALLY MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF WHERE FEASIBLE, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DISCLOSURE STATEMENT WAS FILED. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. IMPORTANTLY, PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT AND ANY EXHIBITS HERETO, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN SECTION V HEREIN, "PLAN RELATED RISK FACTORS."

4843-8094-8070, v. 1

**TABLE OF CONTENTS**

I. BACKGROUND TO THIS CHAPTER 11 CASE ................................................................................. 8

A.    THE DEBTORS' HISTORY ................................................................................................... 8
B.    EVENTS LEADING TO THE CHAPTER 11 FILING ............................................................. 10

II. EVENTS DURING THE CHAPTER 11 CASES ............................................................................. 11

A.    FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF ................................................. 11
    1.    Employment and Compensation of Schwartz Flansburg, PLLC .............................. 11
    2.    Authorization for Use of Cash Collateral ............................................................... 11
B.    OTHER EVENTS DURING THE CHAPTER 11 CASE ......................................................... 12
C.    REORGANIZATION STRATEGY ........................................................................................ 12

III. SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ...... 12
    Purpose of the Plan of Reorganization ........................................................................... 12
    Unclassified Claims ........................................................................................................ 12
    Administrative Claims .................................................................................................... 12
    Priority Tax Claims ......................................................................................................... 13
    General Unsecured Claims .............................................................................................. 14
    Equity Interests of the Debtor ........................................................................................ 16
A.    MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................. 16
    1.    General Settlement of Claims ................................................................................. 16
    2.    Restructuring Transactions ..................................................................................... 16
    3.    Sale of the Debtors' Property ................................................................................. 17
    4.    New Value Contribution .......................................................................................... 18
    5.    Vesting of Assets in the Reorganized Debtors ........................................................ 19
    6.    New Equity Interests ............................................................................................... 19
B.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 20
    1.    Assumption and Rejection of Executory Contracts and Unexpired Leases .............. 20
        (a)    Assumption of Executory Contracts and Unexpired Leases .............................. 20
        (b)    Approval of Assumptions ................................................................................. 20
        (c)    Assignment of Executory Contracts or Unexpired Leases ................................. 20
        (d)    Rejection of Executory Contracts or Unexpired Leases .................................... 21
    2.    Claims on Account of the Rejection of Executory Contracts or Unexpired Leases ...... 21
    3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .............. 21
    4.    Contracts and Leases Entered into After the Petition Date ..................................... 21
C.    PROVISIONS GOVERNING DISTRIBUTIONS .................................................................... 22
    1.    Distributions for Claims Allowed as of the Effective Date ...................................... 22
    2.    Distributions on Account of Claims Allowed After the Effective Date ...................... 22
        (a)    Rejection of Executory Contracts or Unexpired Leases .................................... 22
        (b)    Special Rules for Distributions to Holders of Disputed Claims .......................... 22
    3.    Delivery and Distributions and Undeliverable or Unclaimed Distributions .............. 22
        (a)    Record Date for Distributions .......................................................................... 22
        (b)    Special Rules for Distributions to Holders of Disputed Claims .......................... 22
        (c)    Distributions by Distribution Agent ................................................................. 22
        (d)    Minimum Distributions .................................................................................... 23
        (e)    Undeliverable Distributions ............................................................................. 23
    4.    Compliance with Tax Requirements/Allocations .................................................... 24

5. *Timing and Calculation of Amounts to be Distributed* .......................................................... 24
6. *Setoffs* ............................................................................................................................. 25
D. **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS** ............ 25
1. *Resolution of Disputed Claims* ........................................................................................ 25
(a) Allowance of Claims ................................................................................................. 25
(b) Prosecution of Objection to Claims ......................................................................... 25
(c) Claims Estimation ................................................................................................... 25
(d) Expungement or Adjustment of Claims .................................................................. 26
(e) Deadline to File Objections to Claims ..................................................................... 26
2. *Disallowance of Claims* .................................................................................................... 26
3. *Amendment to Claims* ..................................................................................................... 26
E. **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .............. 26
1. *Conditions Precedent to Confirmation* ............................................................................ 26
2. *Conditions Precedent to Consummation* ......................................................................... 26
3. *Waiver of Conditions* ....................................................................................................... 27
4. *Effect of Non-Occurrence of Conditions to Consummation* ............................................. 27
F. **SETTLEMENT, RELEASE AND RELATED PROVISIONS** ............................................................... 27
1. *Compromise and Settlement* ........................................................................................... 27
2. *Preservation of Rights of Action* ..................................................................................... 28
(a) Maintenance of Causes of Action .......................................................................... 28
(b) Preservation of All Causes of Action Not Expressly Settled or Released .............. 28
G. **BINDING NATURE OF THE PLAN** ............................................................................................. 28

IV. **CONFIRMATION AND CONSUMMATION PROCEDURES** ................................................................ **29**

A. SOLICITATION OF VOTES ............................................................................................................. 29
B. CONFIRMATION PROCEDURES .................................................................................................... 29
1. *Confirmation Hearing* ..................................................................................................... 29
2. *Confirmation Hearing Notice* .......................................................................................... 29
3. *Filing Objections to the Plan* ........................................................................................... 29
C. **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** ............................................ 29
1. *Best Interests of Creditors Test/Liquidation Analysis* ...................................................... 30
2. *Feasibility* ........................................................................................................................ 31
3. *Acceptance by Impaired Classes* ..................................................................................... 32
4. *Confirmation Without Acceptance by All Impaired Classes* ............................................ 32
5. *No Unfair Discrimination* ................................................................................................ 32
6. *Fair and Equitable Test* ................................................................................................... 32
D. **CONSUMMATION OF THE PLAN** .............................................................................................. 33

V. **PLAN-RELATED RISK FACTORS** ..................................................................................................... **33**

A. **CERTAIN BANKRUPTCY LAW CONSIDERATIONS** ........................................................................ 33
1. *Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests.* ............... 33
2. *The Debtors May Fail to Satisfy the Vote Requirement* ................................................... 34
3. *The Debtors May Not Be Able to Secure Confirmation of the Plan* .................................. 34
4. *Nonconsensual Confirmation of the Plan May be Necessary* ........................................... 34
5. *The Debtors May Object to the Amount or Classification of a Claim* ................................ 34
6. *Risk of Non-Occurrence of the Effective Date* ................................................................. 35
7. *Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan* ..... 35

6

**B.    RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN** ..........................................35

    *1.    The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court* ..................35

    *2.    The Reorganized Debtors May Not Be Able to Close its Exit Financing* ...................................................35

    *3.    The Debtors' Members Will Control the Reorganized Debtors* ................................................................35

**C.    RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS** ..........................................................35

    *1.    The Financial Information Contained Herein is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed* ..............................................................................................35

    *2.    Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a result, Actual Results May Vary* ......................................................................................................................................................36

**D.    DISCLOSURE STATEMENT DISCLAIMERS** ...........................................................................................36

    *1.    The Information Contained Herein Is for Soliciting Votes Only* ...............................................................36

    *2.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission* .................36

    *3.    The Disclosure Statement Contains Forward Looking Statements* ..........................................................36

    *4.    No Legal or Tax Advice is Provided to You by this Disclosure Statement* ...............................................36

    *5.    No Admissions Are Made by this Disclosure Statement* ..........................................................................37

    *6.    No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections* .....37

    *7.    Nothing Herein Constitutes a Waiver of any Rights to Object to Claims or Recover Transfers and Assets* 37

    *8.    The Information Used Herein Was Provided to the Debtors and Was Relied Upon by the Debtors' Advisors* ......................................................................................................................................................37

    *9.    The Potential Exists for Inaccuracies, and the Debtors have no Duty to Update* ...................................37

    *10.    No Representations Made Outside of the Disclosure Statement Are Authorized* ...............................37

**VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ..........................................38

**A.    LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE** ..................................................................38

**B.    FILING OF AN ALTERNATIVE PLAN OF REORGANIZATION** ........................................................................38

**VII.    RETENTION OF JURISDICTION** ..........................................................................................................38

**VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....................................................39

A.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................39

**B.    IN GENERAL** ...................................................................................................................................40

**C.    U.S. HOLDERS OF CLAIMS** ................................................................................................................41

**D.    NON-U.S. HOLDERS OF CLAIMS** .......................................................................................................41

**E.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE** ...............................................................41

**IX.    GLOSSARY OF DEFINED TERMS** ........................................................................................................41

**X.    RECOMMENDATION** .......................................................................................................................47

## I.    BACKGROUND TO THIS CHAPTER 11 CASE

## A.    THE DEBTORS' HISTORY[1]

The relevant background to this jointly-administered Chapter 11 Case and the Debtors' history is provided in connection with: (i) the Resort; (ii) the Debtors' Corporate Structures; (iii) the Debtors' Largest Creditor; and (iv) the Debtors' Plans Going Forward.

### i.    THE RESORT

The Lucky Dragon Hotel & Casino is the first casino resort in Las Vegas designed from the ground up to create an authentic Asian cultural and gaming experience. Opened in November 2016 at a cost of approximately $165 million, the casino property originally started with: (i) a 27,500 square foot, two-level casino; (ii) 37 gaming tables and 287 slot machines; (iii) 203 hotel rooms, including 15 suites and a penthouse; (iv) 4 Asian inspired restaurants; (v) 3 bars and lounges; (vi) 407-space parking garage; (vii) outdoor infinity pool with cabanas; and (viii) a first class spa including 4 therapy rooms and 6 reflexology stations (collectively, the "**Resort**"). Currently, the enterprise employs 87 people and is primarily operating only the hotel and limited food and beverage service; however, when fully operating, it is projected the Resort will employ 475 people.

The Resort anticipates that once its operation is stabilized, it will be profitable by capitalizing on the underserved Asian gaming community and customers, as well as the growth of the local market on the North Strip. The Debtors' initial core customers consisted of the local Las Vegas Asian and non-Asian market, the regional Asian population, including Los Angeles and San Francisco, and the International Asian visitor, including travelers from Mainland China, Taiwan and Canada.[2] Indeed, nearly 5 million Asian Americans live in California alone, and 200,000 more live in Las Vegas. The Debtors anticipate that with a proper marketing budget and the sufficient stabilization of its operations, coupled with the growth of and development of the North Strip corridor[3] the Resort will flourish, particularly in the local Las Vegas market.

### ii.    THE DEBTORS' CORPORATE STRUCTURES

The Lucky Dragon Hotel and Casino primarily consists of 2 entities: (a) Lucky Dragon Hotel & Casino, LLC (the "**LLC**") and; (b) Lucky Dragon, LP (the "**LP**" and collectively with the LLC, the "**Debtors**").

#### a.    THE LLC

The gaming, hotel and resort operations are owned and controlled by the LLC. Moreover, the LLC leases its 87 employees from the LP. The LLC is controlled by its sole Manager and 100% Member, Las Vegas Economic Impact Regional Center, LLC ("**LVEIRC**"). The LLC commenced its Chapter 11 case by filing a voluntary petition

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article X herein, titled "Glossary of Key Terms." To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the "Glossary of Key Terms" is inconsistent, the definition in the "Glossary of Key Terms" shall control.

[2]    Indeed, the Resort's casino floor is table-game focused and 68% of such tables are designated for Baccarat.

[3]    Experts predict several forthcoming North Strip developments will increase foot traffic and exposure to The Lucky Dragon: (a) Genting Group is slated to open a $4 billion dollar project, Resorts World, in 2020; (b) Wynn Paradise Park, a +/- $2 billon dollar project; (c) The Drew, another $2 billion project, f/k/a Fountainebleau, was recently purchased and is estimated to open in 2020; (d) the Las Vegas Convention Center has plans for a $1.5 billion renovation and expansion of its existing facilities; (e)Wynn West, an estimated $2 billion dollar project envisioned for the lot across from Wynn and Encore; (f) the SLS Las Vegas was recently purchased by a group who is planning to complete approximately $100 million dollars in renovations; (g) the Stratosphere, also recently purchased, is scheduled to receive an estimated $140 million dollars in renovations; and (h) The Palace Station's $191 million dollar renovation project is already underway.

for relief under Chapter 11 of the Bankruptcy Code on February 16, 2018 (the "**Petition Date**") in the United States Bankruptcy Court for the District of Nevada (this "**Court**").

### b.    THE LP

The LP owns the real estate and improvements at 300 West Sahara Avenue, Las Vegas, Nevada (the "**Property**"), and employs 60 full time, 7 part-time people, and 20 employees who are on-call.  The LP's sole general partner is the LVEIRC.  The LP commenced its Chapter 11 case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 21, 2018 in the Court.  The Debtors' cases are being jointly administered under Case No. 18-10792-LEB.

The capital structure between the companies includes approximately 179 individuals who invested $500,000 each, or $89,500,000 in the LP (collectively, the "**EB-5 Investors**"), through the Immigrant Investor Program, or what is commonly referred to as EB-5 investments.

An EB-5 visa is an opportunity for qualified foreign investors to obtain a Green Card for themselves or their families through the Immigrant Investor Program, which was established by Congress in 1992.  The EB-5 program authorized the U.S. Citizenship and Immigration Services to grant Green Cards to foreign investors who help create or save jobs for U.S. citizens. In this case, the enterprise qualified for the EB-5 program, however, obtaining Nevada-issued, non-restricted gaming licenses[4] for each of the 179 EB-5 Investors presented a significant obstacle.[5]  Therefore, the LP, which does not require a gaming license,[6] holds the EB investments and the LLC holds the gaming license. Importantly, however, the Debtor understands through conversations with counsel for the EB-5 Investors that maintaining an ownership role in the LP could be helpful for the EB-5 Investors to satisfy their EB-5 mandates.[7]

### iii.    THE DEBTORS' LARGEST  CREDITOR

In addition, the enterprise is encumbered by two (2) loans from Snow Covered Capital, LLC ("**Snow Covered**"), including an initial $30,000,000 construction loan facility, as well as a $15,000,000 revolving loan (collectively, the "**Snow Covered Loans**").  The Snow Covered Loans, in turn, are secured by a deed of trust dated May 3, 2016, and recorded against the Property.

On September 1, 2017, Snow Covered recorded a Notice of Default with the Clark County Recorder, starting the foreclosure process with respect to the Property. In order to reorganize, preserve jobs, facilitate the orderly payoff of Snow Covered, and the goodwill of the Resort, the Debtors filed their Chapter 11 cases.  Looking forward, the Debtors anticipate a sale or a new value transaction which will pay Snow Covered in full, provide fresh capital, and reenergize the Resort, such that it can become profitable and expand into full operation as quickly as possible.

### iv.    THE DEBTORS' PLANS GOING FORWARD

In order to facilitate its quick emergence from bankruptcy, the Debtors retained Innovation Capital, LLC ("**Innovation**"), as its financial advisor. The Debtors, through Innovation, continue to market the Property and the

---

[4]    A non-restricted gaming license permits the operation of any gaming other than 15 or less slot machines.

[5]    Obtaining a non-restricted gaming license in Nevada involves undergoing one of the most rigorous investigation processes in the county.

[6]    NRS 463.585 simply requires holding and/or intermediary companies to <u>register</u> with the Nevada Gaming Commission.

[7]    Neither the Debtors nor their attorneys are qualified immigration counsel and provide no legal opinions or advice regarding the immigration issues surrounding the EB-5 Investors.  The Debtors' disclosures regarding the same are simply for information purposes only regarding the Debtors' understanding of the immigration issues surrounding the EB-5 Investors.

Resort to interested parties, many of whom expressed interest in the assets and in amounts that would pay Snow Covered in full. Indeed, as of the date hereof, Innovation contacted 279 parties in connection with the marketing of the Debtors' assets, facilitated the execution of 13 non-disclosure agreements for parties interested in a purchase or transaction with the Debtors to review the relevant information necessary for interested parties to formulate an offer. In addition, 16 parties expressed interest in the Debtors and their assets, and are currently negotiating a non-disclosure agreement.

Importantly, through consummation of the Plan,[8] the Debtors anticipate facilitating a reorganization strategy that not only protects Snow Covered's secured claims, but provides unsecured creditors an opportunity to recover for their claims, and gives EB-5 Investors an opportunity to preserve their investments, to the extent each are possible. Accordingly, the Debtors believe confirmation and consummation of the Plan is the best opportunity for all interested parties to preserve and maximize the value of the Property and the Resort.

If confirmed and consummated, the Plan will eliminate millions of dollars of debt from the Debtors' balance sheets and permit the Debtors to: (i) maintain ongoing operations without the unsustainable burden of their existing debt load; or (ii) allow a new party to purchase the Property and assume control of the operations at the Resort.

Finally, the Debtors believe that the classification and treatment of parties contemplated by the Plan maximize stakeholder recoveries and preserves the possibility of ongoing operations of the Resort for the benefit of numerous parties-in-interest in this jointly-administered Chapter 11 Case. Accordingly, the Debtors now seek the Court's approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. The Debtors submit this Disclosure Statement is in accordance with such requirements. This Disclosure Statement includes information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Section I.A hereof);
- events leading to the Chapter 11 Case (Section I.B hereof);
- material events in the Chapter 11 Case (Section II hereof);
- certain risk factors Holders of Claims and Interests should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Section V hereof);
- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Section III hereof);
- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Section II.F hereof);
- the statutory requirements for confirming the Plan (Section IV.C hereof);
- certain securities law matters (Section V.D hereof); and
- certain United States federal income tax consequences of the Plan (Section VIII hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code. The LLC's sole member, and the LP's general partner, LVERIC, approves of the Plan and the treatment contemplated therein and believes the Plan is in the best interests of the Debtors' Estates. As such, the Debtors' recommend that all Holders entitled to vote accept the Plan by returning their Ballots and Master Ballots, as applicable, so that Prime Clerk LLC, the Debtors' Notice and Claims Agent (the "**Notice and Claims Agent**"), actually receives such Ballots or Master Ballots by the Voting Deadline. Assuming the Plan receives the requisite acceptances, the Debtors will seek the Court's approval of the Plan at the Confirmation Hearing.

## B.    EVENTS LEADING TO THE CHAPTER 11 FILING

---

[8] As used herein, "Plan" means the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, a copy of which is attached as Exhibit A to this Disclosure Statement and incorporated herein by reference, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of thereof, and including all exhibits thereto.

Due to the aforementioned problems and the pending foreclosure, on February 16, 2018, (the "**Petition Date**"), the LLC filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Five (5) days later, on February 21, 2018, the LP filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Chapter 11 case of the LLC and the Chapter 11 case of the LP shall be collectively referred to as the "**Chapter 11 Cases**".

## II.        EVENTS DURING THE CHAPTER 11 CASES

### A.        FIRST DAY MOTIONS AND CERTAIN RELATED RELIEF

On or around the Petition Date, in addition to filing its voluntary petition for relief, the Debtors also filed various motions (collectively, the "**First Day Motions**") with the Bankruptcy Court.  The Bankruptcy Court entered several orders to, among other things, (i) prevent interruptions to the maintenance of the Debtors' property, (ii) ease the strain on the Debtors' relationships with certain essential constituents, such as utility providers, and (iii) allow the Debtors to retain bankruptcy counsel to assist it with the administration of the Chapter 11 Case (each, a "**First Day Order**").

#### 1.        Employment and Compensation of Schwartz Flansburg, PLLC

To assist the Debtors in carrying out their duties and to avoid certain conflicts of interest with the Bankruptcy Case, on April 2, 2018, the Bankruptcy Court entered an interim order authorizing the Debtors to retain and employ Schwartz Flansburg, PLLC ("**SF**") as the Debtors' general bankruptcy counsel.  On May 14, 2018, the Bankruptcy Court approved the Debtors' retention of SF on a final basis.

#### 2.        Authorization for Use of Cash Collateral

In order to allow the Debtors to use their cash, including any cash collateral of Snow Covered, the Debtors filed motions for authority to use cash collateral.  On March 1, 2018, the Bankruptcy Court entered an interim order approving the Debtors' use of cash collateral, and on April 10, 2018, the Bankruptcy Court entered a final order approving the use of cash collateral through May 31, 2018.

On May 10, 2018, the Debtors filed a second motion for use of cash collateral, which hearing is set for May 29, 2018, at 9:30 a.m.

#### 3.        Appointment of the Official Committee of Unsecured Creditors

On March 8, 2018, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "**OUCC**"), with Aristocrat Technologies, Inc. and Gaming Partners International USA as members of the OUCC.

#### 4.        Retention of Additional Professionals

To assist the Debtors in their duties as debtors in possession, and to proceed through a thoughtful marketing and auction of the Debtors' Property, the Debtors retained Innovation as their financial advisors in the Chapter 11 cases.  On May 14, 2018, the Bankruptcy Court approved the Debtors' retention application of Innovation.

In the event of any conflict between the LLC and the LP, the LP hired and retained Dawn Cica of Mushkin Cica Coppedge ("**MCC**") as conflicts counsel for the LP.  On May 14, 2018, the Bankruptcy Court approved the Debtors' retention application of MCC.

#### 5.        Authorization of Debtor-in-Possession Financing

In order to ensure that the Debtors have sufficient cash to pay for operating expenses and Chapter 11 administrative expenses as the Debtors proceed through a thoughtful sale process, the Debtors negotiated in good faith with LD Lender, LLC, an Illinois limited liability company, for debtor-in-possession financing loan up to $3,000,000.  The Debtors filed the application on May 10, 2018, which seeks a first priority priming lien against the Debtors' Property, and the application is set for hearing before the Bankruptcy Court on May 29, 2018, at 9:30 a.m.

### B.    OTHER EVENTS DURING THE CHAPTER 11 CASE

In addition to the above events, on March 19, 2018, Snow Covered filed a motion for relief from the automatic stay to proceed with its foreclosure against the Debtors' Property.  The motion was opposed by the Debtors, the OUCC, and several EB-5 Investors.  On April 26, 2018, the Bankruptcy Court held a hearing on the motion, and continued the hearing to May 14, 2018.  On May 14, 2018, the Bankruptcy Court denied the Motion.

### C.    REORGANIZATION STRATEGY

The Debtors focused on developing and executing a reorganization strategy to: (a) maximize the value of their Estates; (b) address the factors that led to the bankruptcy filing; and (c) enable the Debtors to emerge from Chapter 11 as a stronger, more viable company, or, in the alternative, to proceed through a thoughtful sale process to sell their Property for the highest and best value.  Specifically, this reorganization strategy is primarily (though not exclusively) focused on pursuing the sale of the Debtors' Property in order to maximize distributions to the Debtors' creditors.

### III.    SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

> **THIS SECTION III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE <u>MATERIAL TERMS</u> OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN, AND SHOULD <u>NOT</u> BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL GOVERN.**

**Purpose of the Plan of Reorganization**

As required by the Bankruptcy Code, the Plan, a copy of which is attached hereto as **Exhibit A**, places Claims in separate Classes and describes the treatment each Class will receive.  The Plan also states whether each Class of Claims is impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

**Unclassified Claims**

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code.  They are not considered impaired, and Holders of such Claims do not vote on the Plan.  They may, however, object if, in such Claim Holder's view, the treatment under the Plan does not comply with that required by the Bankruptcy Code.  As such, the Debtors did *not* place the following Claims in any Class:

**Administrative Claims**

Administrative Claims are Claims for the costs or expenses of administering the Debtors' Chapter 11 Cases which are Allowed under section 507(a)(2) of the Bankruptcy Code.  Administrative Claims also include the expenses for the value of any goods or services sold to the Debtors in the ordinary course of business.  The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

Section 506(c) of the Bankruptcy Code allows a debtor in possession to surcharge a secured creditor for expenses incurred in preserving, protecting, enhancing the value of, or disposing of the secured creditor's collateral.  <u>See</u> 11 U.S.C. § 506(c).  To recover under section 506(c) of the Bankruptcy Code, the debtor in possession must make payments on account of reasonable and necessary expenses primarily to protect, preserve, enhance the value of, or dispose of collateral, which payments provide a "direct and quantifiable benefit" to the secured creditor.  <u>See</u> <u>In re Compton Impressions, Ltd.</u>, 217 F.3d 1256, 1262 (9th Cir. 2000) (allowing the debtor to surcharge the secured creditor for legal fees to the extent that the debtor's counsel assisted in the sale of the collateral property); <u>In re Orfa Corp. of Philadelphia</u>, 149 B.R. 790 (Bankr. E.D. Pa. 1993), vacated on other grounds, 1994 WL 163666 (E.D. Pa.

April 26, 1994) (allowing the trustee to surcharge the secured creditor for its services to the degree that its services protected the value of the secured creditor's collateral); In re Cann & Saul Steel Co., 86 B.R. 413 (Bankr. E.D. Pa. 1988) (allowing professional fees that benefited the secured creditor to be surcharged against its collateral).

In this Chapter 11 case, the Debtors may seek to surcharge Snow Covered's collateral from the sale proceeds of the Property as the Debtor will be preserving, protecting and enhancing the value of the Property through the marketing and auction/sale process.

The following chart lists the Debtors' estimated Administrative Claims, and their proposed treatment under the Plan:

| TYPE | ESTIMATED AMOUNT OWED | PROPOSED TREATMENT |
|---|---|---|
| Expenses Arising in the Ordinary Course of Business After the Petition Date including the Debtor In Possession Financing | Current as of the date of filing of the Disclosure Statement, and approximately $600,000.00. | Paid in full on the Effective Date of the Plan, or according to terms of the related obligation if later. |
| Professional Fees, as approved by the court | $1,875,000.00 | Paid in full on the Effective Date of the Plan or as approved by the Court or agreed between the Debtor and administrative claimants. |
| Vendor Fees | $0.00 | Paid in full on or before the Effective Date of the Plan. |
| U.S. Trustee Fees | $250,000.00 | Paid in full on or before the Effective Date of the Plan. |
| **TOTAL** | $2,125,000.00 | |

**Priority Tax Claims**

Priority Tax Claims are unsecured income, employment and other taxes described by section 507(a)(8) of the Bankruptcy Code. Unless the Holder of such a section 507(a)(8) Priority Tax Claim agrees otherwise, it must receive the present value of such Claim, in regular installments paid over a period not exceeding 5 years from the Petition Date.

**Secured Claims**

Class 1 shall be the Secured Claim of the Clark County Taxing Authority, which shall be Impaired, and paid in full on the Effective Date of the Plan.

Class 2 shall be the Secured Claim of Snow Covered, which Claim shall be Impaired. The holder of the Allowed Class 2 Claim shall be Impaired, and shall receive payment of its Allowed Class 2 Claim, subject to the Election, of either: (i) the Sale of the Property as set forth in Article V, Section B of the Plan on the Effective Date; or (ii) its distributions set forth in Article V, Section C of the Plan, subject to the New Value Contribution and the Equity Contribution, starting on the Effective Date.

If the Election is to pursue approval of Article V, Section C of the Plan, any unpaid principal balance owed to the Holder of the Allowed Class 2 Claim shall: (i) be paid interest at 5% on its unpaid principal balance; (ii) be amortized over 30 years; (iii) be subject to the terms and conditions of the Class 2 Claim's underlying loan documents and deed of trust; and (iv) mature and be due and payable on the second anniversary of the Effective Date. The Holder of the Allowed Class 2 Claim shall retain its lien against the Property, to the same extent and priority such lien held as the Confirmation Hearing, until such time as it is paid in full.

13

Snow Covered asserts the amount of the Class 2 claim of Snow Covered, as of the Petition Date, is $49,632,209.91.[9]

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class 1 | Secured Claim of the Clark County Taxing Authority | Impaired | Paid in full, on the Effective Date of the Plan, in the approximate amount of $320,000. |
| Class 2 | Secured Claim of Snow Covered Capital, LLC | Impaired | Paid in full from: from the Sale of the Property as set forth in Article V, Section B of the Plan; or (ii) its distributions set forth in Article V, Section C of the Plan and subject to the New Value Contribution and the Equity Contribution. The Holder of the Allowed Class 2 Claim shall be paid interest at 5% on its unpaid principal balance, based upon a 30 year amortization, until paid in full, on or before the second anniversary of the Effective Date. |

**General Unsecured Claims**

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under section 507(a) of the Bankruptcy Code.

Classes 3 through 5 shall consist of the unsecured claims against the Debtors' estates. Class 3 shall consist of general unsecured claims against the LLC only. Class 4 shall consist of general unsecured claims against the LP only. Finally, Class 5 shall consist of the unsecured claims against both the LLC and the LP. The following chart identifies the Plan's proposed treatment of Class Number 3, which contains the General Unsecured Claims against the Debtor:

| Class # | Description | Impairment | Treatment |
|---|---|---|---|
| Class 3 | General Unsecured Claims Against the LLC Only | Impaired | Each Holder of an Allowed Class 3 Claim shall be paid its Pro Rata share with Classes 4 and 5 of any proceeds from the sale of the Property (as set forth in Article V, Section B of the Plan) remaining after the satisfaction of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Allowed Claims in Classes 1 and 2. Alternatively, if the Election is to pursue approval of Article V, Section C, Holders of Allowed Class 3 Claims shall receive their Pro Rata share with classes 4 |

---

[9]     Snow Covered asserts, as of the Petition Date, that it is owed a total of $49,632,209.91, plus interest, late fees and default interest. Nothing herein shall be construed as a waiver to the Debtors' rights to review and/or object to Snow Covered's claims.

14

| | | | |
|---|---|---|---|
| | | | and 5 of the Initial New Value Contribution and the Equity Contribution, after the payment of the Allowed Class 1 Claims, Allowed Professional Compensation, Priority Tax Claims and Priority Non-Tax Claims. |
| Class 4 | General Unsecured Claims Against the LP Only | Impaired | Each Holder of an Allowed Class 4 Claim shall be paid its Pro Rata share with Classes 3 and 5 of any proceeds from the sale of the Property (as set forth in Article V, Section B of the Plan) remaining after the satisfaction of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Allowed Claims in Classes 1 and 2. Alternatively, if the Election is to pursue approval of Article V, Section C, Holders of Allowed Class 4 Claims shall receive their Pro Rata share with classes 3 and 5 of the Initial New Value Contribution and the Equity Contribution, after the payment of the Allowed Class 1 Claims, Allowed Professional Compensation, Priority Tax Claims and Priority Non-Tax Claims. |
| Class 5 | General Unsecured Claims Against Both the LLC and LP | Impaired | Except to the extent that a Holder of an Allowed Class 5 Claim has been paid by the Debtors prior to the Effective Date or agrees to alternate treatment, each Holder of an Allowed Class 5 Claim shall be paid its Pro Rata share with Classes 3 and 4 of any proceeds from the sale of the Property (as set forth in Article V, Section B of the Plan) remaining after the satisfaction of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Allowed Claims in Classes 1 and 2. Alternatively, if the Election is to pursue approval of Article V, Section C, Holders of Allowed Class 5 Claims shall receive their Pro Rata share with classes 3 and 4 of the Initial New Value Contribution and the Equity Contribution, after the payment of the Allowed Class 1 Claims, Allowed Professional Compensation, Priority Tax Claims and Priority Non-Tax Claims. |

4843-8094-8070, v. 1

**Equity Interests of the Debtor**

Equity Interest Holders are parties who hold an ownership interest (i.e., equity interest) in the Debtors and are classified here in Class 6. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a limited liability company, the equity interest holders are the members. Finally, with respect to an individual who is a debtor, the debtor is the equity interest holder.

In this Chapter 11 Case, the Debtors are a limited liability company and a limited partnership. Upon the Effective Date of the Plan, the Debtors' Equity Interest Holders may retain their Equity Interests in exchange for the Equity Contribution to the Debtors' estates to fund the Plan in an amount to be determined in connection with the solicitation of the Plan. In exchange for the Equity Contribution, the Debtors' equity holders shall receive their Pro Rata share of 25% of the Equity Interests in the Reorganized Debtors, as more fully set forth in Article V of the Plan. If certain of the Debtors equity holders do not make the Equity Contribution, those equity holders will not receive any of the New Equity Interests in the Reorganized Debtors.

In order for the Debtors' Equity Interest Holders to comply with the Bankruptcy Code and Ninth Circuit Court of Appeals case law, the Equity Contribution must be 1) new, 2) substantial, 3) money or money's worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value of interest received.

Here the Equity Contribution satisfies these requirements because the Equity Contribution: 1) to be submitted constitute new contributions, 2) is substantial in so much as it is necessary to make confirmation feasible, 3) is money or money's worth, 4) is necessary for a successful reorganization and 5) is equal to or greater than the value to be received, as the Debtors' assets may be worth less than secured debt.

Therefore, the Debtors' Equity Interests are Impaired to the extent they must make the Equity Contribution to retain their Equity Interests and will be entitled to vote to accept or reject the Plan. Should the Debtors' Equity Interest Holders fail to make any portion of their respective Equity Contribution, such Equity Interest Holders shall not retain any Equity Interests in the Reorganized Debtors.

### A.     MEANS FOR IMPLEMENTATION OF THE PLAN

### 1.     General Settlement of Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration for the classification, distributions, releases and other benefits provided under the Plan, and as a result of arm's-length negotiations among the Debtors and other parties in interest, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. The Debtors submit the confirmation of the Plan also cures defaults under all prepetition contracts paid or maintained herein and in accordance with section 1124 of the Bankruptcy Code.

### 2.     Restructuring Transactions

Prior to, on or after the Effective Date, and pursuant to the Plan, the Debtors and the Reorganized Debtors shall enter into the restructuring transactions (each, a "**Restructuring Transaction**"), and shall take any actions as may be necessary or appropriate to affect a restructuring of its business or the overall organizational structure of the Reorganized Debtors. The Restructuring Transactions may include one or more sales, mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. As of the date hereof, the actions to effect the Restructuring Transactions may include:

- the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree;

- the filing of appropriate certificates or articles of formation, reformation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and
- all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

The documents and agreements necessary to finalize the Debtors' ultimate Restructuring Transaction shall be set forth in the Plan Supplement. During the Confirmation Hearing, the Debtors shall make the Election, and notify parties-in-interest that their principal Restructuring Transaction shall be either the Sale of the Property described in Article V, Section B, or the New Value Contribution described in Article V, Section C.

     **3.**        **Sale of the Debtors' Property**

Pursuant to the Plan and subject to the Election, and as the Debtors' first alternate Restructuring Transaction, the Debtor seeks to sell its Property in conjunction with the Plan Confirmation process. As set forth in the Disclosure Statement, on May __, 2018, the Court entered an order approving the Bid Procedures.[10] As set forth in the Bid Procedures, the Debtors will extensively market the Property up to the bid deadline, which is ten (10) days prior to the Confirmation Hearing, and will mail notice of the Debtors' proposed auction sale and bid procedures through their marketing and restructuring advisors, Innovation Capital. A copy of the Bid Procedures is attached hereto as **Exhibit B**, and interested parties should refer to the Bid Procedures in connection with making a Qualified Bid for the Resort and/or the Property.

Interested parties shall have through _____, 2018 (the "**Due Diligence Deadline**"), to review information related to the Debtors, the Resort or the Property, visit the Property and inspect the Resort, formulate bids, and participate at the Sale Hearing, as set forth in the Bid Procedures. The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access to the Resort and Property. The Debtors shall not be obligated to furnish any due diligence information after the Due Diligence Deadline. The Debtors also reserve the right not to provide due diligence information or access to any interested party that the Debtors conclude in its reasonable business judgment is not likely to become a Qualified Bidder after consultation with and consent of the OUCC.

Any person who desires to bid for the sale of the Resort and Property shall deliver a Qualifying Bid to the Debtors' counsel, SF, Innovation, and the OUCC by _____, 2018 (the "**Bid Deadline**"). A bid received by the Debtors for the Property of the Debtors shall constitute a "**Qualifying Bid**" as described in the Bid Procedures. Subject to the Election and the confirmation process, Snow Covered may credit bid up to the amount of its secured claim, to the full extent permitted by sections 363, 1111(b) and 1129 of the Bankruptcy Code and applicable law, as each may be applicable, provided such bid is received by the Debtors' counsel by the Bid Deadline. Snow Covered will not be required to provide a Deposit.

As set forth in the Bid Procedures, the Sale Hearing shall also serve as an auction (the "**Auction**"), whereby Qualified Bidders may submit subsequent bids for the purchase of the Resort and Property, provided: (i) that the initial bid at the Auction must exceed the highest and best Qualifying Bid by at least $500,000.00, and, if there is a Stalking Horse Bidder, 3.0% of the Stalking Horse Bidder's purchase price; (ii) each subsequent bid at the Auction must exceed the previous bid by at least $250,000.00 (the "**Bidding Increment**"); and (iii) any Qualifying Bidder which submits a subsequent bid at the Sale Hearing in excess of its Qualifying Bid must provide evidence that it has the financial capability to purchase the Debtors' Resort and Property at the new, higher purchase price as set forth in its subsequent bid. At the conclusion of Auction, the Bankruptcy Court shall: (i) determine which bid constitutes the highest and best offer and which bidder constitutes the winning bidder (respectively, the "**Winning Bid**" and the "**Winning Bidder**"); and (ii) approve the Winning Bid at the Sale Hearing.

As set forth in the Bid Procedures, promptly after the entry by the Bankruptcy Court of its order approving the sale of the Debtors' Resort and the Property, the Deposits submitted by all Qualifying Bidders (other than the bid

---

[10]     In the event of a conflict between the Plan and the Bid Procedures set forth on **Exhibit B**, the terms of the Bid Procedures shall control.

of the Winning Bidder(s) and the Back-Up Bidder, as defined below) shall be returned to the respective Qualifying Bidders. The Deposit(s) of the Winning Bidder(s) shall be applied to the sale price set forth in the Winning Bidder's Definitive Agreement, as may be modified by the Winning Bid. If a Winning Bidder fails to consummate the purchase of the Resort and Property contemplated under its Definitive Agreement, as may be modified by the Winning Bid, and (i) such failure is the result of the Winning Bidder's breach of its Definitive Agreement, and (ii) the Debtors having met all closing conditions of the Winning Bidder's Definitive Agreement, the Deposit of such Winning Bidder shall be forfeited to the Debtors. Notwithstanding this forfeiture, the Debtors specifically reserve the right to seek all additional available damages from any defaulting Winning Bidder. Notwithstanding the foregoing, the Bankruptcy Court may hear any matter in connection with the proposed sale of the Resort and Property, including, controversies relating to any bidders' due diligence and to challenge any determination made in connection therewith. In the event the Winning Bidder does not close on the Resort and Property as set forth in such Winning Bidder's Definitive Agreement, the Debtors shall pursue a sale of the Resort and Property to the next highest and best Qualifying Bidder (which shall be determined by the Court at the hearing on approval of the sale to the Winning Bidder) (the "**Back-Up Bidder**"). The Debtors will retain the Back-Up Bidder's Deposit until the sale to the Winning Bidder closes and the Back-up Bidder shall remain obligated to close a sale transaction with the Debtors based on the Back-Up Bidder's Definitive Agreement until the Sale to the Winning Bidder closes. Within one business day of the closing of the Sale to the Winning Bidder, the Debtors will return the Deposit to the Back-Up Bidder.

In the event that the Debtors, in consultation with Committee, determine that it is in the best interests of the estates to select one of the Qualifying Bidders (or if prior to the Bid Deadline, any bidder) to serve as the stalking horse bidder (the "**Stalking Horse Bidder**") for the Sale, the Debtors may file a Notice with the Court notifying parties of the selection of the Stalking Horse Bidder (the "**Stalking Horse Bidder Notice**"). The Debtors will be authorized to provide such Stalking Horse Bidder with a break-up fee and expense reimbursement that are in the aggregate no more than three percent (3%) of the cash purchase price to be provided under the Definitive Agreement. Any party that objects to the Stalking Horse selection as set forth in the Stalking Horse Bidder Notice may file a request for a hearing on shortened notice on the Stalking Horse selection.

The Effective Date of the Plan shall not occur until the Winning Bidder or the Back-up Bidder, as applicable, closes on the Property and completes all obligations pursuant to the Definitive Purchase Agreement (as approved by the Bankruptcy Court), including payment of the purchase price to the Debtors.

## 4. New Value Contribution

Alternatively, subject first to the Election, the Debtors may pursue, as their principal Restructuring Transaction, a deal which injects $55 million into the Debtors' estates, paid in accordance with that certain letter of intent from Mr. Zhiming Zhan (the "**LOI**"), and subject to those documents and agreements set forth in the Plan Supplement. The $55 million will be received by the Debtors and distributed as follows: (a) on the Effective Date, (i) $10 million will be paid to the Holder of the Allowed Class 2 Claim; (ii) $6 million will be used to pay the Holders of the Allowed Class 1 Claims, Allowed Professional Compensation, and the Holders of Allowed Claims in Classes 3 through 5; and (iii) $4 million shall be held in reserve to fund the ongoing operations of the Reorganized Debtors (the "**Initial New Value Payment**"); (b) $20 million will be paid on the first anniversary of the Effective Date (the "**Second New Value Payment**"), all of which will be applied to the then outstanding balance of the Allowed Class 2 Claim; and (c) $15 million will be paid on or about the date that is 545 days after the Effective Date, which amount will retire the remaining balance on the Allowed Class 2 Claim (the "**Third New Value Payment**" – together with the Initial New Value Payment and the Second New Value Payments, the "**Zhan New Value Payments**"). The balance of the Third New Value Payment that is unnecessary to retire the Allowed Class 2 Claim shall be used to fund the operations of the Reorganized Debtors. In the event any of the proceeds from the Initial New Value Payment exceed the amounts necessary to pay the Allowed Class 1 Claims, Allowed Professional Compensation, Priority Tax Claims, Priority Non-Tax Claims, and the Holders of Allowed Claims in Classes 3 through 5, such amounts shall be held in reserve to support the costs of operating the Property and the Resort. In exchange for the Zhan New Value Payments, Mr. Zhan or his designee (the "**Zhan Parties**") shall receive 75% of the New Equity Interests.

In addition, on the Effective Date, the Reorganized Debtors shall issue up to 25% of the New Equity Interests to those Equity Interest Holders who make the Equity Contribution. Specifically, the Debtors shall take

those steps necessary to offer 25% of the New Equity Interests to the Equity Interest Holders, such that the Equity Interest Holders may acquire up to 25% of the New Equity Interests. Based on the LOI, the value of the Reorganized Debtors is $64 million. Accordingly, the Debtors shall distribute 25% of the New Equity Interests to those Equity Interest Holders who participate in the Debtors' reorganization by electing to acquire a Pro Rata share of 25% of the New Equity Interests, subject to those documents and agreements set forth in the Plan Supplement.

Equity Interest Holders shall have until _____, 2018, to notify the Debtors of their intent to acquire up to 25% of the New Equity Interests, provide adequate assurance of performance acceptable to the Debtors, in their sole discretion, and agree to be bound by those organizational documents of the Reorganized Debtors set forth in the Plan Supplement (the "**New Equity Acquisition Deadline**"). The Equity Contribution process will run concurrently with the sale process procedures set forth above, and the New Equity Acquisition Deadline shall be the same date as the Bid Deadline. In connection with the solicitation of this Plan, Equity Interest Holders shall receive notice of the New Equity Acquisition Deadline, how to provide the Debtors with notice of the Equity Interest Holders intent to make an Equity Contribution, and the amount necessary to receive any of the 25% of the New Equity Interests of the Debtors as set forth in Article V, Section G herein. Subject to (a) the occurrence of the Effective Date, and (b) payment of the amounts necessary to acquire up to 25% of the New Equity Interests, upon the Effective Date, the Debtors will issue the Pro Rata share of the New Equity Interests to those Equity Interest Holders that participate by the New Equity Acquisition Deadline.

The cash amounts paid to satisfy the Equity Contribution shall be paid Pro Rata to the Holders of Allowed Claims in Classes 3 through 5 (until paid in full), and then to the Holder of the Allowed Class 2 Claim on the Effective Date in partial satisfaction of the Class 2 Claim.

In the event a party other than the Zhan Parties elect to pursue a "new value" plan similar to those proposed in this Section C, either as a result of participation in the Bid Procedures, or in tandem with any of the Equity Interest Holders, the Debtors reserve the right to accept such proposal and demonstrate any alternate "new value" plan is confirmable at the Confirmation Hearing.

**5.        Vesting of Assets in the Reorganized Debtors**

To the extent applicable after the Election, except as otherwise provided in the Plan, any sale of the Property or in any agreement, instrument or other document relating thereto, on or after the Effective Date, all property of the Estate (including, without limitation, Causes of Action) and any property acquired by the Debtors pursuant to the Plan, shall vest in the Reorganized Debtors, free and clear of all liens, Claims, charges or other encumbrances. Except as may be provided in the Plan and any sale of the Property, on and after the Effective Date, the Reorganized Debtors may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors shall pay the charges that they incur after the Effective Date for Retained Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Retained Professional fee applications) without application to the Bankruptcy Court.

**6.        New Equity Interests**

To the extent applicable after the Election, on or immediately after the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all securities required to be issued pursuant hereto. The LP shall issue 75% of its New Equity Interests to the Zhan Parties and 25% of its New Equity Interests to the Equity Interest Holders that participate in the Equity Contribution as set forth in Section C, on a Pro Rata basis. The LLC shall issue 100% of its New Equity Interests to the entity or entities designated by the parties, such that the Debtors' licensing as a hotel and casino property will be preserved.

The New Equity Interests issued under the Plan are issued under Section 1145 of the Bankruptcy Code and will be freely tradable, subject to any applicable restrictions of the federal and state securities laws. All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Each distribution and issuance referred to in **Error! Reference source not found.** hereof shall be

governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### B.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

(a)    <u>Assumption of Executory Contracts and Unexpired Leases</u>

Subject to the right of the Reorganized Debtors to elect to reject any Executory Contract or Unexpired Lease as to which there is an objection to the proposed cure, each Executory Contract or Unexpired Lease shall be deemed automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code as of the Effective Date, unless any such Executory Contract or Unexpired Lease:

- has been previously rejected by the Debtors by Final Order of the Bankruptcy Court;

- has been rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date;

- is the subject of a motion to reject pending as of the Effective Date;

- is listed on the schedule of "Rejected Contracts and Unexpired Leases" in the Plan Supplement; or

- is otherwise rejected pursuant to the Plan.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  The Debtors reserve the right to amend the schedule of Rejected Executory Contracts and Unexpired Leases at any time before the Effective Date.

(b)    <u>Approval of Assumptions</u>

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions described in the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of such Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

(c)    <u>Assignment of Executory Contracts or Unexpired Leases</u>

In the event of an assignment of an Executory Contract or Unexpired Lease, at least ten (10) Days prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (i) list the applicable cure amount, if any; (ii) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (iii) describe the procedures for filing objections thereto; and (iv) explain the process by which related disputes will be resolved by the Bankruptcy Court.  Any applicable cure amounts shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related cure amount must be filed, served and actually received by the Debtors and its counsel at least five (5) Days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails

to object timely to the proposed assignment or cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease. The Confirmation Order shall constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assignment. If an objection to assignment or cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors, in its sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

(d)  Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases listed on the schedule of "Rejected Executory Contracts and Unexpired Leases" in the Plan Supplement shall be deemed rejected as of the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court approving the rejections described in the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

2.    **Claims on Account of the Rejection of Executory Contracts or Unexpired Leases**

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty (30) Days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors or the Reorganized Debtors or their Estates and property, and the Debtors or the Reorganized Debtors and their Estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.

3.    **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least ten (10) Days prior to the Confirmation Hearing, the Debtors shall file with the Bankruptcy Court and serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption, which will: (a) list the applicable cure amount, if any; (b) describe the procedures for filing objections thereto; and (c) explain the process by which related disputes will be resolved by the Bankruptcy Court.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least five (5) Days prior to the Confirmation Hearing. Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code, shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. If an objection to a Cure Claim is sustained by the Bankruptcy Court, the Reorganized Debtors, in its sole option, may elect to reject such executory contract or unexpired lease in lieu of assuming it.

4.    **Contracts and Leases Entered into After the Petition Date**

4843-8094-8070, v. 1

Contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, will be performed by the Debtors or Reorganized Debtors in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

C.      **PROVISIONS GOVERNING DISTRIBUTIONS**

1.      **Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed before the Effective Date on or as soon as practicable after the Initial Distribution Date; provided, however, that payments on account of General Unsecured Claims that become Allowed Claims on or before the Effective Date shall commence on the Effective Date.

2.      **Distributions on Account of Claims Allowed After the Effective Date**

(a)      Rejection of Executory Contracts or Unexpired Leases

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties, distributions under the Plan on account of a Disputed Claim that becomes an Allowed Claim after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) Days after the Disputed Claim becomes an Allowed Claim.

(b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding anything in the Plan to the contrary, and except as otherwise agreed to by the relevant parties, no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtors shall establish appropriate reserves for potential payment of such Claims pursuant to Article VIII of the Plan.

3.      **Delivery and Distributions and Undeliverable or Unclaimed Distributions**

(a)      Record Date for Distributions

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those Holders of Claims listed on the Claims Register as of the close of business on the Distribution Record Date.  If a Claim is transferred twenty (20) or fewer Days before the Distribution Record Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

(b)      Special Rules for Distributions to Holders of Disputed Claims

Except as otherwise provided in the Plan, the Debtors or the Reorganized Debtors, as applicable, shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors or the Reorganized Debtors, as applicable; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

(c)      Distributions by Distribution Agent

The Debtors and the Reorganized Debtors, as applicable, shall have the authority, in their sole discretion, to enter into agreements with one or more Distribution Agents to facilitate the distributions required under the Plan.

As a condition to serving as a Distribution Agent, a Distribution Agent must (i) affirm its obligation to facilitate the prompt distribution of any documents, (ii) affirm its obligation to facilitate the prompt distribution of any recoveries or distributions required under the Plan and (iii) waive any right or ability to setoff, deduct from or assert any lien or encumbrance against the distributions required under the Plan that are to be distributed by such Distribution Agent.

The Debtors or the Reorganized Debtors, as applicable, shall pay to the Distribution Agents all reasonable and documented fees and expenses of the Distribution Agents without the need for any approvals, authorizations, actions or consents. The Distribution Agents shall submit detailed invoices to the Debtors or the Reorganized Debtors, as applicable, for all fees and expenses for which the Distribution Agent seeks reimbursement and the Debtors or the Reorganized Debtors, as applicable, shall pay those amounts that they, in their sole discretion, deem reasonable, and shall object in writing to those fees and expenses, if any, that the Debtors or the Reorganized Debtors, as applicable, deem to be unreasonable. In the event that the Debtors or the Reorganized Debtors, as applicable, objects to all or any portion of the amounts requested to be reimbursed in a Distribution Agent's invoice, the Debtors or the Reorganized Debtors, as applicable, and such Distribution Agent shall endeavor, in good faith, to reach mutual agreement on the amount of the appropriate payment of such disputed fees and/or expenses. In the event that the Debtors or the Reorganized Debtors, as applicable, and a Distribution Agent are unable to resolve any differences regarding disputed fees or expenses, either party shall be authorized to move to have such dispute heard by the Bankruptcy Court.

The Distribution Agents, and their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals (collectively, the "**Indemnified Parties**") shall be indemnified and held harmless by the Debtors and the Reorganized Debtors, to the fullest extent permitted by law for any losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of the Distribution Agents solely in their capacity as such; provided, however, that the Debtors and the Reorganized Debtors shall not be liable to indemnify any Indemnified Party for any act or omission constituting gross negligence, fraud or reckless, intentional or willful misconduct. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity from which they are indemnified.

(d)    Minimum Distributions

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall not be required to make distributions or payments of less than $10.00 (whether Cash or otherwise) and shall not be required to make partial distributions or payments of fractions of dollars. Whenever any payment or distribution of a fraction of a dollar under the Plan would otherwise be called for, the actual payment or distribution will reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

No Distribution Agent shall have any obligation to make a distribution on account of an Allowed Claim if: (i) the aggregate amount of all distributions authorized to be made on the Periodic Distribution Date in question is or has an economic value less than $10,000.00, unless such distribution is a final distribution; or (ii) the amount to be distributed to the specific Holder of an Allowed Claim on such Periodic Distribution Date does not constitute a final distribution to such Holder and is or has an economic value less than $10.00, which shall be treated as an undeliverable distribution under Article VII.C. of the Plan.

(e)    Undeliverable Distributions

Holding of Certain Undeliverable Distributions. If any distribution to a Holder of an Allowed Claim made in accordance herewith is returned to the Reorganized Debtors (or the Distribution Agent) as undeliverable, no further distributions shall be made to such Holder unless and until the Reorganized Debtors (or the Distribution Agent) is notified in writing of such Holder's then current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors, subject to Article VII.C. of the Plan, until such time as any such distributions become deliverable. Undeliverable distributions shall not be entitled to any additional interest, dividends or other accruals of any kind on account of their distribution being undeliverable.

23

Failure to Claim Undeliverable Distributions. No later than 210 Days after the Effective Date, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of undeliverable distributions. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Case stays open. Any Holder of an Allowed Claim, irrespective of when a Claim becomes an Allowed Claim, that does not notify the Reorganized Debtors of such Holder's then current address in accordance herewith within the latest of (i) one year after the Effective Date, (ii) 60 Days after the attempted delivery of the undeliverable distribution and (iii) 180 Days after the date such Claim becomes an Allowed Claim, shall have its Claim for such undeliverable distribution discharged and shall be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or its property. In such cases, (i) any Cash or Equity Interest held for distribution on account of Allowed Claims shall be redistributed to Holders of Allowed Claims in the applicable Class on the next Periodic Distribution Date and (ii) any Cash held for distribution to other creditors shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and become property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

Failure to Present Checks. Checks issued by the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within 180 Days after the issuance of such check. In an effort to ensure that all Holders of Allowed Claims receive their allocated distributions, no later than 180 Days after the issuance of such checks, the Reorganized Debtors shall File with the Bankruptcy Court a list of the Holders of any un-negotiated checks. This list shall be maintained and updated periodically in the sole discretion of the Reorganized Debtors for as long as the Chapter 11 Case stays open. Requests for reissuance of any check shall be made directly to the Distribution Agent by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within 240 Days after the date of mailing or other delivery of such check shall have its Claim for such un-negotiated check discharged and be forever barred, estopped and enjoined from asserting any such Claim against the Reorganized Debtors or its property. In such cases, any Cash held for payment on account of such Claims shall be property of the Reorganized Debtors, free of any Claims of such Holder with respect thereto. Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

4.      **Compliance with Tax Requirements/Allocations**

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances. For tax purposes, distributions in full or partial satisfaction of Allowed Claims shall be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims.

5.      **Timing and Calculation of Amounts to be Distributed**

On the Initial Distribution Date with respect to each Class (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class; provided, however, that distributions on account of General Unsecured Claims that become Allowed Claims before the Effective Date may be paid on the Effective Date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the applicable class treatment or in Article VI of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends or accruals on the

24

distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.      Setoffs

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim.  In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount.  Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided in the Plan.

D.      PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

1.      Resolution of Disputed Claims

(a)      Allowance of Claims

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim.  All settled claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

(b)      Prosecution of Objection to Claims

After the Confirmation Date, the Debtors and the Reorganized Debtors shall have the exclusive authority to File objections to Claims, settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise.  From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without any further notice to or action, order or approval of the Bankruptcy Court. The Reorganized Debtors shall have the sole authority to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval of the Bankruptcy Court. With respect to all Tort Claims, an objection is deemed to have been Filed timely, thus making each such Claim a Disputed Claim as of the Claims Objection Bar Date.  Each such Tort Claim shall remain a Disputed Claim unless and until it becomes an Allowed Claim.

(c)      Claims Estimation

After the Confirmation Date, the Debtors or the Reorganized Debtors may, at any time, request that the Bankruptcy Court estimate (i) any Disputed Claim pursuant to applicable law and (ii) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether the Debtors or the Reorganized Debtors has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim, contingent Claim or unliquidated Claim, including during

25

the litigation concerning any objection to any Claim or during the pendency of any appeal relating to any such objection.

Notwithstanding anything in the Plan to the contrary, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. All of the aforementioned Claims and objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(d)      Expungement or Adjustment of Claims

Any Claim that has been paid, satisfied or superseded may be expunged on the Claims Register by the Reorganized Debtors, and any Claim that has been amended may be adjusted thereon by the Reorganized Debtors, in both cases without a claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

(e)      Deadline to File Objections to Claims

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date

## 2.      Disallowance of Claims

All Claims of any Entity from which property is sought by the Debtors or the Reorganized Debtors under sections 542, 543, 550 or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code shall be disallowed if (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turnover any property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turnover such property by the date set forth in such agreement or Final Order.

**EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM AND PROOFS OF INTEREST FILED AFTER THE APPLICABLE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS AND EQUITY INTERESTS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS AND EQUITY INTERESTS, UNLESS SUCH LATE PROOF OF CLAIM OR EQUITY INTEREST IS DEEMED TIMELY FILED BY A BANKRUPTCY COURT ORDER ON OR BEFORE THE LATER OF (1) THE CONFIRMATION HEARING AND (2) 45 DAYS AFTER THE APPLICABLE CLAIMS BAR DATE.**

## 3.      Amendment to Claims

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and, to the extent such prior authorization is not received, any such new or amended Claim Filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

## E.      CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## 1.      Conditions Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that all provisions, terms and conditions set forth in the Plan are approved in the Confirmation Order.

## 2.      Conditions Precedent to Consummation

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C of the Plan:

- The Plan and all Plan Supplement documents, including any amendments, modifications or supplements thereto, shall be reasonably acceptable to the Debtors.

- The Confirmation Order shall have been entered and become a Final Order in a form and in substance reasonably satisfactory to the Debtors. The Confirmation Order shall provide that, among other things, the Debtors or the Reorganized Debtors, as appropriate, are authorized and directed to take all actions necessary or appropriate to consummate the Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan.

- All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been affected or executed. All conditions precedent all to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable governmental units in accordance with applicable laws.

### 3. Waiver of Conditions

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in Article IX of the Plan may be waived by the Debtors without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### 4. Effect of Non-Occurrence of Conditions to Consummation

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect.

### F. SETTLEMENT, RELEASE AND RELATED PROVISIONS

### 1. Compromise and Settlement

Notwithstanding anything in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan takes into account and conforms to the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(b) and (c) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant to the Plan. The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are: (a) in the best interests of the Debtors, their estates and all Holders of Claims and Equity Interests; (b) fair, equitable and reasonable; (c) made in good faith; and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.

In accordance with the provisions of the Plan and pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date (a) the Reorganized Debtors may, in its sole and absolute discretion, compromise and settle Claims

against it and (b) the Reorganized Debtors may, in its sole and absolute discretion, compromise and settle Causes of Action against other Entities.

### 2.    Preservation of Rights of Action

(a)    Maintenance of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtors shall retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in any adversary proceeding Filed in the Chapter 11 Case.

(b)    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Claim or Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), the Debtors expressly reserve such claim or Cause of Action for later adjudication by the Debtors or the Reorganized Debtors (including, without limitation, claims and Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such claims or Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or codefendants in such lawsuits.

### 3.    Limitation of Liability.

The Debtors, as proponents of the Plan, together with their agents, representatives, advisors and attorneys, and the OUCC, together with their agents, representatives, advisors and attorneys (collectively, the "**Exculpated Parties**"), will neither have nor incur any liability to any person or entity for any Official Actions in good faith taken or omitted to be taken in connection with or related to the Chapter 11 Case, the investigations of potential claims or the formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Chapter 11 Case, provided that, the foregoing shall not exonerate any of the Exculpated Parties from any liability that results from an act or omission to the extent such act or omission is determined by Final Order to have constituted gross negligence or willful misconduct. In addition, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any Exculpated Party for any Official Actions made in good faith from and after the Petition Date through the Confirmation Date in connection with, relating to or arising out of the Chapter 11 case or the consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any transaction or document created or entered into, or any other act taken or omitted to be taken, in connection therewith, except for: (a) the liability of any Exculpated Party that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan, (b) the liability of any Exculpated Party that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct, and (c) actions taken by Exculpated Parties who are holders of a Claim and are taking actions in pursuit of their allowance or payment of such Claim.

### G.    BINDING NATURE OF THE PLAN

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASE OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## IV.    CONFIRMATION AND CONSUMMATION PROCEDURES

### A.    Solicitation of Votes

The process by which the Debtors will solicit votes to accept or reject the Plan is summarized in Disclosure Statement Motion.

**PLEASE REFER TO THE PROCEDURES MOTION FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT VOTES ARE PROPERLY AND TIMELY SUBMITTED SUCH THAT THEY ARE COUNTED AS VOTES TO ACCEPT OR REJECT THE PLAN.**

### B.    Confirmation Procedures

### 1.    Confirmation Hearing

**The Confirmation Hearing will commence at _____ prevailing Pacific Time on _____, 2018.**

**The Plan Objection Deadline is 5:00 p.m. prevailing Pacific Time on _____, 2018.**

All Plan objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.

THE BANKRUPTCY COURT WILL NOT CONSIDER PLAN OBJECTIONS UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

### 2.    Confirmation Hearing Notice

Following the Disclosure Statement Hearing, the Debtors will serve the Confirmation Hearing Notice on all of the Debtors' creditors, parties in interest and parties which have requested notice pursuant to Bankruptcy Rule 2002, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is scheduled to commence.

### 3.    Filing Objections to the Plan

All objections, if any, must (a) be made in writing, (b) conform to the Bankruptcy Rules and the Local Rules for the District of Nevada and (c) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that they are **actually received** on or before the Plan Objection Deadline by each of the parties listed in the table below:

| Name: | Contact Information: |
|---|---|
| Debtors' counsel | Schwartz Flansburg, PLLC<br>Attn: Samuel A. Schwartz, Esq.<br>6623 Las Vegas Blvd. South, Suite 300<br>Las Vegas, Nevada 89119<br>Fax: (702) 385-2741 |

### C.    STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtors believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtors, as the Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan is reasonable; or (b) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan;

- Either each Holder of an Impaired Claim has accepted the Plan, or will receive or retain under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code, including pursuant to section 1129(b) of the Bankruptcy Code;

- Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable;

- At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization;

- The Debtors have paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court as set forth in the Plan; and

- In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtors will pay quarterly fees no later than the last Day of the calendar month, following the calendar quarter for which the fee is owed in the Debtors' Chapter 11 Cases for each quarter (including any fraction thereof), to the Office of the U.S. Trustee, until the case is converted or dismissed, whichever occurs first.

## 1. Best Interests of Creditors Test/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the

plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor is liquidated under chapter 7 of the Bankruptcy Code.  To make these findings, the bankruptcy court must:  (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the debtor's Chapter 11 Case was converted to a chapter 7 case and the assets of such debtor's estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a claim or an equity interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such holder's liquidation distribution to the distribution under the plan that such holder would receive if the plan were confirmed.

In chapter 7 cases, unsecured creditors and equity interest holders of a debtor are paid from available assets generally in the following order, with no junior class receiving any payments until all amounts due to senior classes have been paid fully or any such payment is provided for:  (a) holders of secured claims (to the extent of the value of their collateral); (b) holders of priority claims; (c) holders of unsecured claims; (d) holders of debt expressly subordinated by its terms or by order of the bankruptcy court; and (e) holders of equity interests.

Accordingly, the Cash amount that would be available for satisfaction of Claims (other than Secured Claims) would consist of the proceeds resulting from the disposition of the unencumbered assets of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation. Such Cash would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative and priority claims that may result from termination of the Debtors' business and the use of chapter 7 for purposes of a liquidation.

The Debtors believe that confirmation of the Plan will provide each Holder of an Allowed Claim with a greater recovery than the value of any distributions if the Chapter 11 Case was converted to a case under chapter 7 of the Bankruptcy Code because, among other reasons, the Debtors do not own any significant, tangible assets which could be liquidated.  Specifically, the Debtors' intended refinance of substantially all of its Assets will pay all creditors in full.  Conversely, in a chapter 7 liquidation, the Debtors would be subject to the fees and expenses of a chapter 7 trustee which would likely further reduce Cash available for distribution.  In addition, distributions in chapter 7 cases may not occur for a longer period of time than distributions under the Plan, thereby reducing the present value of such distributions.  In this regard, it is possible that distribution of the proceeds of a liquidation could be delayed for a significant period while the chapter 7 trustee and its advisors become knowledgeable about, among other things, the Chapter 11 Case and the Claims against the Debtors.  As set forth in the Liquidation Analysis, attached hereto as **Exhibit C**, Holders of Equity Interests may not receive any recovery under a chapter 7 liquidation, so the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code with respect to such Classes.

2.      **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by the liquidation of the Reorganized Debtors or the need for further financial reorganization, unless the Plan contemplates such liquidation.  For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtors have analyzed the ability of the Reorganized Debtors to meet its obligations under the Plan and to retain sufficient liquidity and capital resources to conduct its business.

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code because it is refinancing its secured debts encumbering its Assets.  Therefore, confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors analyzed their ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.

In general, the Debtors believe that the refinance of its Assets should result in the payment in full of all parties-in-interest.  The Debtors believe that Confirmation and Consummation is, therefore, not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

3.        **Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (b) cures any default and reinstates the original terms of such obligation; or (c) provides that, on the consummation date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1, 2 and 3 are Impaired under the Plan, and as a result, the Holders of Claims in such Classes are entitled to vote on the Plan.  Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes, and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.  As stated above, Classes of Claims will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims of each such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

4.        **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes entitled to vote on the plan have not accepted it, provided that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

5.        **No Unfair Discrimination**

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent for all such classes, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

6.        **Fair and Equitable Test**

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

- <u>Secured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b)

each holder of a secured claim in the class receives deferred Cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

- <u>Unsecured Claims</u>. The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

- <u>Equity Interests</u>. The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:

  o    the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or

  o    if the class does not receive the amount required in the paragraph directly above, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

**The Debtors do not anticipate that it will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.**  To the extent that any of the Voting Classes vote to reject the Plan, the Debtors, however, reserves the right to seek (a) Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.B. of the Plan.

The Debtors do not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### D.    CONSUMMATION OF THE PLAN

The Plan will be consummated on the Effective Date.  For a more detailed discussion of the conditions precedent to consummation of the Plan and the impact of failure to meet such conditions, see Article IX of the Plan.

### V.    PLAN-RELATED RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.    ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD <u>NOT</u> BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    Parties-in-Interest May Object to the Debtors' Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity

Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Debtors May Fail to Satisfy the Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Articles IV and IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

### 4. Nonconsensual Confirmation of the Plan May be Necessary

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### 5. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and Reorganized Debtors reserve the right to object

to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Thus, any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### 7. Contingencies Will Not Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### B. RISK FACTORS THAT MAY AFFECT RECOVERIES UNDER THE PLAN

### 1. The Valuation of the Reorganized Debtors May Not Be Adopted by the Bankruptcy Court

The approximate value of the Debtors are positive due to the difference between the amount owed on the Loan Documents and the fair market value of the Property. Parties in interest in this Chapter 11 Case may oppose Confirmation of the Plan by alleging that the equity value of the Reorganized Debtors are higher than the amounts projected by the Debtors at confirmation and that the Plan thereby improperly limits or extinguishes their rights to recoveries under the Plan. At the Confirmation Hearing, the Bankruptcy Court may hear evidence regarding the views of the Debtors and opposing parties, if any, with respect to the valuation of the Reorganized Debtors. Based on that evidence, the Bankruptcy Court will determine the appropriate valuation for the Reorganized Debtors for purposes of the Plan.

### 2. The Reorganized Debtors May Not Be Able to Close its Exit Financing

The Reorganized Debtors may not be able to close its exit financing with PacFunding or any lender. To the extent the Reorganized Debtors do not refinance its Real Property, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, or may not be able to meet its operational needs. Any one of these failures may preclude the Reorganized Debtors from consummating the Plan. Although the Debtors' Financial Projections represent management's view based on current known facts and assumptions about the future operations of the Reorganized Debtors, there is no guarantee that the Financial Projections will be realized.

### 3. The Debtors' Members Will Control the Reorganized Debtors

Consummation of the Plan will result in the Debtors' member owning all of the Reorganized Debtors' Equity Interests, thus giving the Debtors' current member the controlling influence over the business and affairs of the Reorganized Debtors, if any.

### C. RISKS ASSOCIATED WITH FORWARD LOOKING STATEMENTS

### 1. The Financial Information Contained Herein is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed

**The financial information contained in this Disclosure Statement has not been audited.** In preparing this Disclosure Statement, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such

financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

> **2. Financial Projections and Other Forward Looking Statements Are Not Assured, Are Subject to Inherent Uncertainty Due to the Numerous Assumptions Upon Which They Are Based and, as a result, Actual Results May Vary**

This Disclosure Statement contains various projections concerning the financial results of the Reorganized Debtors' operations, including the Financial Projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to sell their Property; (c) general business and economic conditions; and (d) overall performance and trends in the commercial real estate industry.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will <u>not</u> be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

### D.    DISCLOSURE STATEMENT DISCLAIMERS

#### 1.    The Information Contained Herein Is for Soliciting Votes Only

The information contained in this Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 2.    This Disclosure Statement Was Not Approved by the Securities and Exchange Commission

This Disclosure Statement has not been filed with the Commission or any state regulatory authority. Neither the Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

#### 3.    The Disclosure Statement Contains Forward Looking Statements

This Disclosure Statement contains "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

#### 4.    No Legal or Tax Advice is Provided to You by this Disclosure Statement

**<u>This Disclosure Statement is not legal advice to you.</u>** The contents of this Disclosure Statement should

not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

      **5.**      **No Admissions Are Made by this Disclosure Statement**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Equity Interest or any other parties in interest.

      **6.**      **No Reliance Should be Placed on any Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement. The Debtors or the Reorganized Debtors, as applicable, (i) may seek to investigate, File and prosecute Claims and Equity Interests and (ii) may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such Claims or Objections to Claims.

      **7.**      **Nothing Herein Constitutes a Waiver of any Rights to Object to Claims or Recover Transfers and Assets**

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Reorganized Debtors (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified herein.

      **8.**      **The Information Used Herein Was Provided to the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to the Debtors has performed certain limited due diligence in connection with the preparation of this Disclosure Statement, it has not verified independently the information contained herein.

      **9.**      **The Potential Exists for Inaccuracies, and the Debtors have no Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors, nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

      **10.**      **No Representations Made Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, and the United States Trustee.

## VI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.    Liquidation Under Chapter 7 of the Bankruptcy Code

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtors' assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth in Section IV.C. herein, titled "Statutory Requirements for Confirmation of the Plan." In performing the liquidation analysis, the Debtors have assumed that all Holders of Claims will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. The Debtors believe that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) smaller distributions being made to creditors than those provided in the Plan because the Debtors' only real assets consist of its real property and the improvements thereon, which have less value in a forced liquidation, (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of unexpired leases and executory contracts in connection with the cessation of the Debtors' operations, and (iv) the potential failure to realize the greater, going-concern value of all of the Debtors' assets.

### B.    Filing of an Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. During the negotiations prior to the filing of the Plan, the Debtors explored various alternatives to the Plan.

The Debtors believe that the Plan enables the Debtors to emerge from chapter 11 successfully and expeditiously, and allows creditors to realize the highest recoveries under the circumstances. As compared to a liquidation under chapter 7 of the Bankruptcy Code, a liquidation under chapter 11 of the Bankruptcy Code, the assets of the Debtors would be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7, and a trustee need not be appointed. Thus, the administrative costs associated with a chapter 11 liquidation are less than the costs associated with a chapter 7 liquidation, and creditors normally receive greater recoveries in a chapter 11 liquidation than in a chapter 7 liquidation.

## VII.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtors and the Plan as legally permissible, including, without limitation, jurisdiction to:

1.    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim;

2.    grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Confirmation Date;

3.    resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors or the Reorganized Debtors may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to the Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

4.    resolve any issues related to any matters adjudicated in the Chapter 11 Case;

5.   ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.   decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, *provided* however, that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

7.   enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan, the Plan Supplement or the Disclosure Statement;

8.   resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.   hear and determine all Causes of Action that are pending as of the Effective Date or that may be commenced in the future;

10.   issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan, except as otherwise provided in the Plan;

11.   enforce any terms of the Plan;

12.   resolve any cases, controversies, suits or disputes with respect to any injunctions or similar provisions contained in the Plan and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such injunctions and other provisions;

13.   enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14.   resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

15.   enter an order concluding the Chapter 11 Case.

**VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.   EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A.    **Certain Federal Income Tax Consequences of the Plan**

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to Holders of Allowed Claims.  This summary is based on the Internal Revenue Code (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative

positions of the Internal Revenue Service (the "**IRS**") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion is for general information only and does not purport to address all aspects of U.S. federal income taxation that may be relevant to Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies or regulated investment companies). This discussion only addresses the tax consequences to Holders of Claims who have held such Claims as capital assets within the meaning of the IRC. No aspect of foreign, state, local or estate and gift taxation is addressed.

Importantly, the Debtors anticipate that the Restructuring Transactions will be exempt from taxation pursuant to Section 1146 of the Bankruptcy Code. Accordingly, little or no tax liability will accrue if the Plan is confirmed.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.**

**B.      In General**

The U.S. federal income tax consequences of the distributions contemplated by the Plan to Holders of Claims will depend upon a number of factors. The character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided thereby will depend upon, among other things, (i) the manner in which a Holder acquired a Claim, (ii) the length of time the Claim has been Held, (iii) whether the Claim was acquired at a discount, (iv) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (v) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim (vi) the method of tax accounting of the Holder, and (vii) whether the Claim is an installment obligation for U.S. federal income tax purposes.

For purposes of the following discussion, a "U.S. Holder" is any person (i) who is a citizen resident of the United States; (ii) that is a corporation or partnership created or organized in or under the laws of the United States or any state thereof of the District of Columbia; (iii) that is an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) that is a trust (a) the administration over which a United States person can exercise primary supervision and all of the substantial decisions of which one or more United States persons have the authority to control or (b) that has elected to continue to be treated as United States person for U.S. federal income tax purposes. A "Non-U.S. Holder" is any person that is not a U.S. Holder. In the case of a partnership, the tax treatment of its partners will depend on the status of the partner and the activities of the partnership. Holders who are partnerships or partners in a partnership should consult their tax advisors.

Certain Holders of Claims (such as foreign persons, S corporations, regulated investment companies, insurance companies, financial institutions, small business investment companies, broker-dealers, and tax exempt organizations) may be subject to special rules not addressed in this summary of the U.S. federal tax consequences. There also may be state, local and/or foreign income or other tax considerations or U.S. federal estate and gift tax consideration applicable to Holders of Claims, which are not addressed herein. EACH HOLDER OF A CLAIM OR EQUITY INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR WITH RESPECT TO DISTRIBUTIONS RECEIVED UNDER THE PLAN.

### C.    U.S. Holders of Claims

A U.S. Holder should generally recognize capital gain or loss for U.S. income tax purposes in an amount equal to the difference between the amount of Cash (and other consideration received) under the Plan in respect of such Holder's Claim and the Holder's adjusted tax basis in the Claim.  However, to the extent a U.S. Holder received any Cash (or other consideration) in satisfaction of any accrued and unpaid interest, such Holder may recognize ordinary income or loss to the extent that such Cash (or other consideration) is allocable to the accrued and unpaid interest, unless such Holder has previously included the accrued interest in such Holder's taxable income.

### D.    Non-U.S. Holders of Claims

A Non-U.S. Holder of a Claim generally will not be subject to the U.S. federal income tax with respect to any income or gain recognized upon the exchange of such Holder's Claim with Cash (or other property) pursuant to the Plan, unless (i) such Holder is engaged in a trade or business in the United States to which income, gain from the exchange is "effective connected" for U.S. federal income tax purposes, or (ii) if such Holder is an individual, such Holder is present in the United States for 183 Days or more during the taxable year of the exchange and certain other requirements are met.  To the extent any cash (or other consideration) is distributed for accrued and unpaid interest, however, a Non-U.S. Holder may be subject to U.S. withholding taxes at (30%) unless such Holder is qualified for the so-called "portfolio interest exemption" or eligible to claim a reduction or exemption under any applicable treaty and complies with certain required certification procedures.

### E.    Importance of Obtaining Professional Tax Assistance

The U.S. federal income tax consequences to a Holder other than a Holder receiving Cash (or other property) in satisfaction of such Holder's Claim may be different from the tax consequences described above. Holders of each such Claim should consult their tax advisers regarding potential federal income tax consequences.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S., STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### IX.    Glossary of Defined Terms

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, will include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document will be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed will mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (e) unless otherwise stated, the words ''herein,'' "hereof" and ''hereto'' refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (f) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules will have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

Unless the context otherwise requires, the following terms will have the following meanings when used in capitalized form herein:

41

1.      "*Accrued Professional Compensation*" means, at any given moment, all accrued, contingent and/or unpaid fees and expenses (including, without limitation, success fees and Allowed Professional Compensation) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date by any Retained Professionals in the Chapter 11 Case, that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not been previously paid regardless of whether a fee application has been Filed for any such amount.  To the extent that the Bankruptcy Court or any higher court denies or reduces by a Final Order any amount of a Retained Professional's fees, then those reduced or denied amounts shall no longer constitute Accrued Professional Compensation.

2.      "*Administrative Claim*" means any Claim for costs and expenses of administration of the Estate under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code (excluding claims under section 503(b)(9) of the Bankruptcy Code), including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtors; (b) Allowed Professional Compensation; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.  Administrative Claims do not include DIP Lender Claims, which are separately treated under the Plan.

3.      "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

4.      "*Allowed*" means, with respect to Claims or Equity Interests:  (a) any Claim or Equity Interest, proof of which is timely Filed by the applicable Claims Bar Date (or which by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim or Equity Interest that is listed in the Schedules as of the Effective Date as not contingent, not unliquidated and not disputed, and for which no Proof of Claim or Interest has been timely Filed; or (c) any Claim or Equity Interest Allowed pursuant to the Plan; *provided*, *however,* that with respect to any Claim or Equity Interest described in clause (a) above, such Claim or Equity Interest shall be considered Allowed only if and to the extent that (x) with respect to any Claim or Equity Interest no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed for distribution purposes only by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors or the Reorganized Debtors and without any further notice to or action, order or approval of the Bankruptcy Court.

5.      "*Allowed Professional Compensation*" means all Accrued Professional Compensation Allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

6.      "*Assets*" means all of the Debtors' right, title and interest of any nature in property, wherever located, as specified in section 541 of the Bankruptcy Code.

7.      "*Avoidance Actions*" means any and all claims and causes of action which the Debtors, the Debtors in possession, the Estate, or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

8.      "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims (modified, as necessary, based on voting party in accordance with the Disclosure Statement Order) entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

9.      "*Bankruptcy Code*" means Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended and applicable to the Chapter 11 Case.

10.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the District of Nevada, having jurisdiction over the Chapter 11 Case and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code and/or the Order of the United States District Court for the District of Nevada pursuant to section 157(a) of title 28 of the United States Code, the United States District Court for the District of Nevada.

11.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under 28 U.S.C. § 2075 and the general, local and chambers rules of the Bankruptcy Court.

12.      *"Bid Procedures"* means those certain procedures concerning the sale of the Debtors' Property and attached hereto as **Exhibit B**.

13.      *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

14.      *"Cash"* means the legal tender of the United States of America or the equivalent thereof.

15.      *"Causes of Action"* means all actions, causes of action (including Avoidance Actions), Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Case, including through the Effective Date.

16.      *"Chapter 11 Case"* means the Chapter 11 case pending for the Debtors under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

17.      *"Claim"* means any claim against a Debtors as defined in section 101(5) of the Bankruptcy Code.

18.      *"Claims Bar Date"* means, as applicable, (a) June 20, 2018, (b) the Governmental Bar Date of August 15, 2018, or (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claims.

19.      *"Claims Objection Bar Date"* means, for each Claim, the later of (a) 180 Days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims; *provided, however*, that in no event shall the Claims Objection Bar Date be greater than 120 Days after the Effective Date with respect to any General Unsecured Claim in Class 3.

20.      *"Claims Register"* means the official register of Claims maintained by the Bankruptcy Court.

21.      *"Class"* means a category of Holders of Claims or Equity Interests as set forth in Article II hereof pursuant to section 1122(a) of the Bankruptcy Code.

22.      *"Commencement"* or *"Petition Date"* means February 16, 2018, the date on which the LLC commenced the Chapter 11 case, or February 21, 2018, the date the LP commenced its Chapter 11 Case.

23.      *"Commission"* means the U.S. Securities and Exchange Commission.

24.      *"Committee"* means the Official Unsecured Creditors Committee.

25.      *"Confirmation"* means the entry of the Confirmation Order on the docket of the Chapter 11 Case, subject to all conditions specified in Article IX of the Plan having been:  (a) satisfied; or (b) waived pursuant to Article IX of the Plan.

26.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case, within the meaning of Bankruptcy Rules 5003 and 9021.

27.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.    "*Confirmation Hearing Notice*" means that certain notice of Confirmation Hearing approved by the Disclosure Statement Order.

29.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

30.    "*Consummation*" means the occurrence of the Effective Date.

31.    "*Creditor*" means a Holder of a Claim.

32.    "*Cure Claim*" means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors under sections 365 or 1123 of the Bankruptcy Code.

33.    "*Day*" means any day, including Saturdays, Sundays and legal holidays.

34.    "*Debtors*" means Lucky Dragon Hotel & Casino, LLC, and Lucky Dragon, LP, each in their individual capacity as debtors in these Chapter 11 Cases.

35.    "*Debtors in Possession*" means the Debtors, as Debtors in possession in this Chapter 11 Case.

36.    "*Disclosure Statement*" means the *Disclosure Statement for the Plan of Reorganization of Lucky Dragon Hotel & Casino, LLC, and Lucky Dragon LP Under Chapter 11 of the Bankruptcy Code*, as amended, supplemented or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law.

37.    "*Disclosure Statement Motion*" means that certain *Motion for Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtors' Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan and (vii) Appointing Schwartz Flansburg, PLLC As Solicitation And Tabulation Agent* filed with the Bankruptcy Court on _____, as the Motion may be amended from time to time.

38.    "*Disclosure Statement Order*" means that certain *Order (i) Approving The Disclosure Statement; (ii) Approving The Form Of Ballots And Proposed Solicitation And Tabulation Procedures; (iii) Fixing The Voting Deadline With Respect To The Debtors' Chapter 11 Plan; (iv) Prescribing The Form And Manner Of Notice Thereof; (v) Fixing The Last Date For Filing Objections To The Chapter 11 Plan; (vi) Scheduling A Hearing To Consider Confirmation Of The Chapter 11 Plan (vii); and Appointing Schwartz Flansburg, PLLC As Solicitation And Tabulation Agent,* approved by the Bankruptcy Court on _____, as the order may be amended from time to time.

39.    "*Disputed Claim*" means, with respect to any Claim or Equity Interests, any Claim or Equity Interests on (a) the Claims Register that is not yet Allowed, or (b) Scheduled as Disputed.

40.    "*Distribution Agent*" means the Debtors.

44

41.    *"Distribution Record Date"* means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Voting Deadline or such other date as designated in an order of the Bankruptcy Court.

42.    *"Effective Date"* means the Day that is the first Business Day occurring which is at least fifteen (15) Days after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article IX of the Plan have been: (i) satisfied; or (ii) waived pursuant to Article IX of the Plan.

43.    *"Entity"* means an entity as defined in section 101(15) of the Bankruptcy Code.

44.    *"Equity Contribution"* means those contributions made by the Debtors' Equity Holders to fund the Plan, and receive their Pro Rata share of the New Equity Interests, which may include exchanges of unsecured debt for the New Equity Interests.

45.    *"Equity Interest"* means any (a) security interest in the Debtors, including all issued, unissued, authorized, or outstanding shares of stock together with any warrants, options, or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, or (b) partnership, limited liability company, or similar interest in the Debtors, including those interests held by the EB-5 Holders.

46.    *"Estate"* means, as to the Debtors, the estate created for the Debtors in their Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

47.    *"Exchange Act"* means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, or any similar federal, state or local law.

48.    *"Executory Contract"* means a contract to which the Debtors are a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

49.    *"File"* or *"Filed"* means file, filed or filing with the Bankruptcy Court or its authorized designee in this Chapter 11 Case.

50.    *"Final Order"* means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in the Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

51.    *"General Unsecured Claim"* means any claim against the Debtors that is not (i) an Administrative Claim, (ii) Priority Tax Claim, (iii) Priority Non-Tax Claim, or (iv) a Secured Claim.

52.    *"Governmental Bar Date"* means August 15, 2018.

53.    *"Holder"* means an Entity holding a Claim or an Equity Interest.

54.    *"Impaired"* means any Claims in an Impaired Class.

55.    *"Impaired Class"* means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

56.    "*Initial Distribution Date*" means the date that is as soon as practicable after the Effective Date, but no later than thirty (30) Days after the Effective Date, when distributions under the Plan shall commence.

57.    "*New Equity Interests*" means the equity in Reorganized Debtors to be authorized, issued or reserved on the Effective Date pursuant to the Plan, which shall constitute all of the direct or indirect equity of the Reorganized Debtors.

58.    "*New Value Contribution*" means the money or money's worth paid through the Plan and as set forth in Article V, Section C of the Plan, and Article III(A)(4) of this Disclosure Statement.

59.    "*Official Actions*" means actions taken by the Exculpated Parties in their official capacities in the Chapter 11 Case after the Petition Date through the Confirmation Date.

60.    "*Periodic Distribution Date*" means the first Business Day that is as soon as reasonably practicable occurring no later than approximately 180 Days after the Initial Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring no later than 180 Days after the immediately preceding Periodic Distribution Date.

61.    "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

62.    "*Petition Date*" means February 16, 2018, the date on which the LLC commenced the Chapter 11 Case.

63.    "*Plan*" means the *Plan of Reorganization of Lucky Dragon Hotel & Casino, LLC and Lucky Dragon, LP Under Chapter 11 of the Bankruptcy Code* dated May ___, 2018, as amended, supplemented or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated therein by reference.

64.    "*Plan Sponsor*" means the Entity purchasing the land and improvements thereon owned and operated by the Debtors, which assets are being sold pursuant to the Plan.

65.    "*Plan Supplement*" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are incorporated by reference into, and are an integral part of, the Plan, including those documents necessary to formalize and execute the Equity Contribution, as all of the same may be amended, modified, replaced and/or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and the Bankruptcy Rules. The Plan Supplement shall be filed by the Debtors on a date that is 14 calendar days prior to the Confirmation Hearing.

66.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment pursuant to section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

67.    "*Priority Tax Claim*" means any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

68.    "*Proof of Claim*" means a proof of Claim Filed against the Debtors in the Chapter 11 Case.

69.    "*Proof of Interest*" means a proof of Equity Interest filed against the Debtors in the Chapter 11 Case.

70.    "*Pro Rata*" means the proportion that an Allowed Claim or Equity Interest in a particular Class bears to the aggregate amount of Allowed Claims or Equity Interests in that Class, or the proportion that Allowed Claims or Equity Interests in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Equity Interest under the Plan.

71.      *"Record Date"* means the close of business on August 15, 2018.

72.      *"Reorganized Debtors* means the Debtors, or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

73.      *"Retained Professional"* means any Entity: (a) employed in this Chapter 11 Case pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

74.      *"Schedules"* mean, collectively, the schedules of assets and liabilities and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified or supplemented from time to time.

75.      *"Secured"*  means a Claim secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is secured pursuant to section 365(j) of the Bankruptcy Code, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, in each case to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

76.      *"Securities Act"* means the United States Securities Act of 1933, as amended.

77.      *"SF"* means Schwartz Flansburg PLLC.

78.      *"Solicitation Deadline"* means the close of business on _____.

79.      *"Tort Claim"* means any Claim that has not been settled, compromised or otherwise resolved that: (a) arises out of allegations of personal injury, wrongful death, property damage, products liability or similar legal theories of recovery; or (b) arises under any federal, state or local statute, rule, regulation or ordinance governing, regulating or relating to protection of human health, safety or the environment.

80.      *"Unexpired Lease"* means a lease to which the Debtors are a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

81.      *"Unimpaired"* means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

82.      *"Unimpaired Class"* means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

83.      *"Unimpaired Claim"* means any Claim in an Unimpaired Class.

84.      *"Voting Classes"* means Classes 1, 2, 3, 4 and 5.

85.      *"Voting Deadline"* means _____, 2018 at 5:00 p.m. prevailing Pacific Time for all Holders of Claims, which is the date and time by which all Ballots must be received by the Debtors, in accordance with the Disclosure Statement Order, or such other date and time as may be established by the Bankruptcy Court with respect to any Voting Class.

## X.      RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a

liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than that which is proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan support Confirmation of the Plan and vote to accept the Plan.


Respectfully submitted,

Lucky Dragon Hotel & Casino, LLC

By:       /s/ Andrew Fonfa
Title:      Manager of the Managing Member

Lucky Dragon LP

By:       /s/ Andrew Fonfa
Title:      Manager of the General Partner


/s/Samuel A. Schwartz
Samuel A. Schwartz, Esq.
Attorneys for the Debtors

48

**EXHIBITS**

**Exhibit A –** Copy of Proposed Plan of Reorganization

**Exhibit B** – Bid Procedures

**Exhibit C –** Liquidation Analysis

4843-8094-8070, v. 1