## * * § 362 INFORMATION SHEET * *

| | | |
|---|---|---|
| LUCKY DRAGON HOTEL & CASINO, LLC<br>LUCKY DRAGON, LP | 18-10792-led -<br>LEAD | Jointly administered<br>with 18-10850-leb |
| DEBTOR | Case No: | MOTION #: |
| SNOW COVERED CAPITAL, LLC | | |
| MOVANT | CHAPTER:    11 | |

### _Certification of Attempt to Resolve the Matter Without Court Action:_

_Moving counsel hereby certifies that pursuant to the requirements of LR 4001(a)(2), an attempt has been made to resolve the matter without court action, but movant has been unable to do so._

Date:    June 15, 2018                    Signature:  /s/ Nathan G. Kanute
                                                                    _Attorney for Movant_

PROPERTY INVOLVED IN THIS MOTION:   300 W. Sahara, Las Vegas, NV
NOTICE SERVED ON:    Debtor(s)            Debtor's counsel    X            Trustee    X
DATE OF SERVICE:        June 15, 2018; via CM/ECF

| MOVING PARTY'S CONTENTIONS: | | DEBTOR'S CONTENTIONS: | |
|---|---|---|---|
| The EXTENT and PRIORITY of LIENS: | | The EXTENT and PRIORITY of LIENS: | |
| 1st | $320,099.36 (tax lien) | 1st | |
| 2nd | $52,257,992.61 (on 5/29/18–w/o fees & costs) | 2nd | |
| 3rd | | 3rd | |
| 4th | | 4th | |
| Other: | | Other: | |
| Total Encumbrances: | No less than $52,578,091.97 | Total Encumbrances: | |
| APPRAISAL of OPINION as to VALUE: | | APPRAISAL of OPINION as to VALUE: | |
| $55,500,000 - $60,000,000 | | | |

| TERMS of MOVANT'S CONTRACT<br>with the DEBTOR(S): | | DEBTOR'S OFFER of "ADEQUATE<br>PROTECTION" for MOVANT: |
|---|---|---|
| Amount of Note: | $45,000,000 | ● |
| Interest Rate: | 17.5% | ● |
| Duration: | 1 year | ● |
| Payment per Month: | Interest | ● |
| Date of Default | July 2017 | ● |
| Amount in Arrears: | | ● |
| Date of Notice of Default:    August 18, 2017 | | ● |
| SPECIAL CIRCUMSTANCES: | | SPECIAL CIRCUMSTANCES: |

| SUBMITTED BY: | Nathan G. Kanute | SUBMITTED BY: | |
|---|---|---|---|
| SIGNATURE: | /s/ Nathan G. Kanute | SIGNATURE: | |

**E-filed:  June 15, 2018**

1  Bob L. Olson (NV Bar No. 3783)
   Nathan G. Kanute (NV Bar No. 12413)
2  SNELL & WILMER L.L.P.
   3883 Howard Hughes Parkway, Suite 100
3  Las Vegas, NV 89169
   Telephone: (702) 784-5200
4  Facsimile: (702) 784-5252
   Email:  bolson@swlaw.com
5          nkanute@swlaw.com
   *Attorneys for Snow Covered Capital, LLC*

6

7                 **UNITED STATES BANKRUPTCY COURT**

8                        **DISTRICT OF NEVADA**

9   In Re:                                  Case No. 18-10792-leb
                                            Lead Case
10  LUCKY DRAGON HOTEL & CASINO,
    LLC,                                    Chapter 11
11
              Debtor.
12
    ──────────────────────────────         Jointly Administered with:
13  LUCKY DRAGON, LP,                       Case No. 18-10850-leb

14            Debtor.
                                            **RENEWED MOTION FOR RELIEF FROM**
15                                          **THE AUTOMATIC STAY**

16                                          **Hearing Date:  July 17, 2018**
                                            **Hearing Time:  9:30 a.m.**
17
                                            **Hearing Location:**
18                                             **United States Bankruptcy Court**
                                               **Foley Federal Building, Courtroom No. 3**
19                                             **300 Las Vegas Blvd South, Third Floor**
                                               **Las Vegas, Nevada 89101**
20

21        Snow Covered Capital, LLC ("SCC"), secured creditor and party-in-interest in the above-

22  captioned jointly administered Chapter 11 bankruptcy cases ("Bankruptcy Case") of Lucky

23  Dragon Hotel & Casino, LLC ("Lucky Dragon") and Lucky Dragon, LP ("Borrower",

24  collectively with Lucky Dragon, "Debtors"), pursuant to 11 U.S.C. § 362(d), hereby respectfully

25  requests that this Court enter an order terminating the automatic stay of 11 U.S.C. § 362(a) to

26  allow SCC to exercise any and all of its available remedies with respect to its collateral, the

27  Property (as defined below).  This Court should grant SCC relief from the automatic stay for

28  "cause" under § 362(d)(1) because SCC is not adequately protected.  Any equity Borrower has in

4834-1534-8329

the Property is insufficient for a finding of adequate protection. As this case progresses, the equity continues to erode and will almost certainly be gone when Debtors are forced to close the doors in June or July as they run out of cash. The continuation of the automatic stay keeps SCC from being able to preserve value in the Property and will likely result in SCC being unable to fully recover on its loan to Borrower, which leaves nothing for these estates. The stay should also be terminated under § 362(d)(2) because the Borrower has little to no equity in the Property and the Property is not necessary for an effective reorganization that is in prospect. Additionally, Borrower has admitted that it is a single-asset real estate entity under § 101(51B). The 90-day period set out in § 362(d)(3) passed on May 22, 2018. The Debtors have not made any interest payments to SCC as required under § 362(d)(3)(B). Instead, the Debtors filed their Plan to meet the 90 day deadline. That Plan, however, does not have a reasonable possibility of being confirmed in a reasonable time. Stay relief, therefore, is mandatory.

This Motion is supported by the following Memorandum of Points and Authorities, the § 362 Information Sheet required by LR 4001(a)(2), the Declaration of Enrique Landa filed on May 22, 2018 [ECF No. 416] (the "Landa Declaration"), the Declaration of Keith Harper filed on May 22, 2018 [ECF No. 417] (the "Harper Declaration"), all pleadings and papers of record in this Bankruptcy Case, and any oral argument the Court may entertain.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    JURISDICTION

1.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(a).

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (G), and this is a contested matter pursuant to FED. R. BANKR. P. 9014.

### II.    FACTUAL BACKGROUND

#### A.    The Loan Documents.

3.    On or around May 3, 2016, SCC loaned Borrower $30,000,000.00 and an additional $15,000,000 on a revolving basis (collectively, the "Loan"), pursuant to that certain Construction Loan Agreement (the "Loan Agreement"), that certain Secured Promissory Note (Construction Loan) (the "Construction Loan Note"), and that certain Secured Promissory Note

2

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

1    (Line of Credit) (the "Line of Credit Note"), each dated on or around May 3, 2016.  Landa

2    Declaration, ¶ 5 and Exhibits 1, 2, and 3.

3         4.     The Loan was secured by, among other things, that certain Construction Deed of

4    Trust (With Assignment of Leases and Rents, Security Agreement and Fixture Filing) (the "Deed

5    of Trust") dated May 3, 2017, covering that certain real property commonly known as Clark

6    County Assessor's Parcel Number 162-04-816-001 (the "Property"), whereon Borrower

7    constructed the Lucky Dragon Hotel and Casino, which Deed of Trust was recorded on May 11,

8    2016 as Document No. 2016-511-0002786.  Landa Declaration, ¶¶ 4, 6 and Exhibit 4.

9         5.     The Loan Agreement, Construction Loan Note, Line of Credit Note, Deed of

10   Trust, and all documents related to the Loan are collectively referred to herein as the "Loan

11   Documents."

12   **B.**    **Intercreditor Agreement With PDS.**

13        6.     On or about August 23, 2016, SCC entered into an Intercreditor Agreement with

14   Borrower, PDS Gaming Corporation-Nevada, and PDS Gaming Corporation. Landa Declaration,

15   ¶ 8 and Exhibit 5.  Pursuant to the Intercreditor Agreement, SCC agreed that its interests under

16   the Deed of Trust would be subordinate to PDS's claim to the PDS Assets, as defined in the

17   Intercreditor Agreement. *Id.*

18        7.     PDS asserts it is owed $4,043,799.04. ECF No. 423, ¶¶ 35, 51.

19   **C.**    **Borrower's Default Under the Loan Documents.**

20        8.     Borrower defaulted under the Loan Documents by, among other things, failing to

21   pay amounts due and owing under the Loan Documents as of August 3, 2017 (collectively, the

22   "Default").  Landa Declaration, ¶ 9.

23        9.     By letter dated August 14, 2017, SCC notified Borrower and Guarantors that

24   Borrower was in Default under the Loan Documents (the "Default Letter").  The Default Letter

25   demanded that Borrower immediately cure the Default.  Landa Declaration, ¶ 10 and Exhibit 6.

26        10.    Despite demand, Borrower failed to cure the Default.  Landa Declaration, ¶ 11.

27        11.    Accordingly, SCC noticed a trustee's sale of the Property for February 6, 2018 (the

28   "Notice of Trustee's Sale").  Landa Declaration, ¶ 12 and Exhibit 7.  The trustee's sale has been

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

3

1    postponed until June 15, 2018. SCC will have to republish the trustee's sale since it has been

2    orally postponed three times.

3         12.    In addition to the foregoing, Borrower has failed to pay the real property taxes due

4    on the Property. The past due property taxes total $320,099.36. *See* Claim No. 3, Case No.

5    18 10850-leb. The past due taxes continue to accrue interest.

6         13.    Despite projecting a loss of over $2 million through November 2018, Lucky

7    Dragon has also not accounted for the payment of the 2018-2019 property taxes. *See* ECF No.

8    351, Ex. B.

9         14.    The amount due on the Loan as of February 16, 2018, Lucky Dragon's petition

10   date, was $49,632,209.91, which was comprised of $45,000,000 in principal, $3,531,645.67 in

11   non-default interest, and $1,100,564.24 in default interest. Landa Declaration, ¶¶ 13, 14.

12        15.    Interest has and continues to accrue as stated in the Construction Loan Note and

13   Line of Credit Note at the default rate of 17.5% per annum ("Default Rate of Interest") which is

14   $21,875.00 per diem. Landa Declaration, ¶ 13.

15        16.    Additionally, SCC has continued to incur attorney's fees and costs in connection

16   with the Loan. In the last year and a half – January 1, 2017 through May 31, 2018 – the amount

17   owed for attorney's fees and costs was $548,578.35.

18        17.    The amount owed to SCC on May 29, 2018, excluding fees and costs, was

19   $52,257,992.61. The amount owed to SCC, exclusive of attorneys' fees will increase to

20   $53,020,157.20 on June 30, 2018, $53,791,246.46 on July 31, 2018, $54,546,470.49 on

21   August 31, 2018, $55,310,300.72 on September 30, 2018, $56,159,303.73, on October 31, 2018

22   and $56,864,243.35 on November 30, 2018. Landa Declaration, ¶¶ 15, 16.

23   **D.    The Property & Operations.**

24        18.    Borrower owns the Property—*i.e.*, the land and physical buildings located on the

25   Property.

26        19.    Beginning in November 2016, Lucky Dragon operated a casino, hotel, and

27   restaurant businesses on the Property. Lucky Dragon has paid Borrower nothing for the use of

28   the Property since opening.

4834-1534-8329

20. On or about, January 4, 2018, Lucky Dragon closed the casino and all but one restaurant it operated on the Property. Lucky Dragon continues to operate the hotel on the Property, but has projected that it will run out of cash for these operations in June or July 2018.

21. Lucky Dragon and Borrower are generating insufficient revenues to pay their normal operating expenses.

22. On or about February 8, 2018, SCC obtained an appraisal report of the Property (the "Appraisal"). The Appraisal states that, as of January 31, 2018, the "As Is" market value of the going concern was $60 Million. Harper Declaration, ¶ 5, Exhibit 1.

23. On May 7, 2018 SCC obtained an updated Appraisal Report (the "Update") in which Mr. Harper concluded that the value of the Property, as of May 4, 2018, was $55,500,000. Harper Declaration ¶ 7, Exhibit 2. This Court orally ruled that the value of the Property was between $55.5 million and $60 million on June 5, 2018 and SCC had minimal if any equity securing its interests in the Property.

**E.     The Bankruptcy Cases.**

24. On February 16, 2018, Lucky Dragon filed a Chapter 11 petition for relief, initiating this bankruptcy case.

25. On February 21, 2018, Borrower filed a Chapter 11 petition for relief, initiating Case No. 18-10850-leb.

26. On February 21, 2018, Borrower filed a motion to jointly administer its case with that of Lucky Dragon, which the Court granted at the February 21, 2018 hearing.

27. On May 10, 2018, Debtors filed a motion to obtain debtor-in-possession financing ("DIP Motion") and prime SCC's security interest in the Property. [ECF No. 351.]

28. The Court held evidentiary hearings from May 29 through June 1, 2018.

29. During those hearings the Court heard testimony and issued its findings of fact and conclusions of law when denying the DIP Motion that included: (i) SCC's claim is approximately $52.3 million; (ii) Debtors are running out of cash to continue operations and could be unable to meet operating expenses as early as June 22, 2018; (ii) if the hotel on the Property closes, the value of the Property will go down; (iii) the as-is value of the Property as of May 4, 2018 was

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

5

1   $55.5 million to $60 million; (iv) the value of the Property continues to decline; (v) there is

2   minimal if any equity in the Property to adequately protect SCC's interests; (vi) Debtors' Plan

3   does not propose payment in full of SCC's claim; and (vii) authorizing the requested DIP loan

4   would essentially be a substantive consolidation of the Debtors.    The Court entered the order

5   denying the DIP Motion on June 11, 2018 [ECF No. 484].

**III.    LEGAL ARGUMENT**

**A.    "Cause" Exists to Terminate the Automatic Stay Under § 362(d)(1).**

8       A creditor is entitled to relief from the automatic stay under § 362(d)(1) "for cause,

9   including the lack of adequate protection." *See also In re Ellis*, 60 B.R. 432, 435 (B.A.P. 9th Cir.

10   1985) ("Lack of adequate protection is but one example of "cause" for relief from stay."). The

11   Bankruptcy Code does not define "cause" within the meaning of the statute. *In re Mac Donald*,

12   755 F.2d 715, 717 (9th Cir. 1985) (citing 2 *Collier Bankruptcy Manual* § 362.06 (3d ed. 1979)).

13   Thus, courts determine whether "cause" exists to grant stay relief on a case-by-case basis. *Id.*

14       Bankruptcy courts within the Ninth Circuit have explained that "determining cause for

15   stay relief requires the balancing of hardships and consideration of the totality of the

16   circumstances." *In re Avila*, 311 B.R. 81, 83-84 (Bankr. N.D. Cal. 2004) (citing *In re Kennedy*,

17   16 B.R. 488, 490 (Bankr. W.D. Wash. 1994); *see also In re Rodarte*, 2012 WL 6052046, at *6

18   (B.A.P. 9th Cir. Dec. 6, 2012) (citing *In re Nat'l Envtl. Waste Corp.*, 129 F.3d 1052, 1055 (9th Cir.

19   1997) ("[T]he bankruptcy court is required to balance the equities of the creditor's position in

20   comparison to that of the debtor."). Courts thus have broad discretion to lift the automatic stay

21   for "cause." *In re Shawhan*, 2008 WL 8462964, at *7 (B.A.P. 9th Cir. July 7, 2008).

22       For instance, in a case decided by a bankruptcy court in Colorado, the court granted a

23   motion for relief from the automatic stay where the debtor was unable to pay its usual operating

24   expenses. *In re CST Group, Inc.*, 2013 WL 2250210, at *3 (Bankr. D. Colo. May 22, 2013). In

25   that case, the debtor offered to provide adequate protection payments to the creditor requesting

26   stay relief. *Id.* The court explained that the offer of payments was "wholly illusory" because the

27   debtor did not show, in light of its inability to pay operating expenses, that it would be able to

28   provide such payments to the creditor. *Id.* Here, "cause" exists to terminate the automatic stay

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

6

1   because SCC is not adequately protected, the operations are in danger of ceasing, and real

2   property taxes are delinquent and not being paid.

3       1.   <u>SCC is not Adequately Protected.</u>

4       Adequate protection is generally offered in one of three ways: (i) a cash payment or

5   periodic payments; (ii) replacement liens; or (iii) providing other relief that offers the indubitable

6   equivalent of the interest in the property. 11 U.S.C. § 361.  Debtors have not offered SCC any

7   payments or meaningful replacement liens.  Since they have no funds to make payments and no

8   assets on which to grant replacement liens, no such offer is forthcoming.

9       A finding of adequate protection, therefore, can only be premised on Lucky Dragon and

10  Borrower putting forth sufficient evidence to show that SCC enjoys a large equity cushion above

11  the balance due on the Loan.  "A significant equity cushion is a well recognized means of

12  providing adequate protection." *In re Bertran*, at *1, *citing In re Mellor*, 734 F.2d 1396, 1400

13  (9th Cir. 1984) (equity cushion "is the classic form of protection for a secured debt justifying the

14  restraint of lien enforcement by a bankruptcy court.").  How much of an equity cushion is

15  sufficient to constitute adequate protection varies on a case by case basis.  But what is clear in

16  surveying case law, is that an equity cushion of 20% is almost always sufficient, while an equity

17  cushion at or below 10% is almost always insufficient.  *In re Mellor*, at 1401 ("A 20% cushion

18  has been held to be an adequate protection for a secured creditor."); *In re Las Torres*

19  *Development, LLC*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("case law is clear that an equity

20  cushion of 20% or more constitutes adequate protection."); *SunTrust Bank v. Den-Mark Const.,*

21  *Inc.*, 406 B.R. 683, 700, fn.24, *quoting In re James River Assoc.*, 148 B.R. 790, 796 (E.D. Va.

22  1992) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes

23  adequate protection ... [and] has almost as uniformly held that an equity cushion under 11% is

24  insufficient to constitute adequate protection....  Case law is divided on whether a cushion of 12%

25  to 20% constitutes adequate protection....").  The required equity cushion cannot be shown here.

26      As set forth above, the Court has previously found that the value of the Property was

27  between $55,500,000 and $60,000,000, which was based on the Appraisal and the Update.

28  Harper Declaration, ¶¶ 5 & 7, Exhibits 1 & 2.  Although SCC was owed roughly $50,000,000

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

4834-1534-8329

around the petition date, that amount has increased due to accruing interest.  The amount owed to SCC on May 29, 2018, excluding fees and costs, was $52,257,992.61.  The interest will continue to accrue.  When the PDS claim and real property tax claim, set out above, are added to just the principal and interest due to SCC (leaving aside attorney's fees and costs for now) the equity cushion analysis is as follows[1]:

| Date | Amount Owed to SCC, PDS and Property Taxes | Equity Cushion @ $55.5 million | Equity Percentage @ $55.5 million |
|---|---|---|---|
| May 29, 2018 | $56,621,891.01 | ($1,121,891.01) | -2.02% |
| June 30, 2018 | $57,384,055.60 | ($1,884,055.60) | -3.39% |
| July 31, 2018 | $58,155,144.86 | ($2,655,144.86) | -4.78% |
| August 31, 2018 | $58,910,368.89 | ($3,410,368.89) | -6.14% |
| September 30, 2018 | $59,674,199.12 | ($4,174,199.12) | -7.52% |
| October 31, 2018 | $60,523,202.13 | ($5,023,202.13) | -9.05% |
| November 30, 2018 | $61,228,141.75 | ($5,728,141.75) | -10.32% |

| Date | Amount Owed to SCC, PDS, and Property Taxes | Equity Cushion @ $60 million | Equity Percentage @ $60 million |
|---|---|---|---|
| May 29, 2018 | $56,621,891.01 | $3,378,108.99 | 5.63% |
| June 30, 2018 | $57,384,055.60 | $2,615,944.40 | 4.36% |
| July 31, 2018 | $58,155,144.86 | $1,844,855.14 | 3.07% |
| August 31, 2018 | $58,910,368.89 | $1,089,631.11 | 1.82% |
| September 30, 2018 | $59,674,199.12 | $325,800.88 | 0.54% |
| October 31, 2018 | $60,523,202.13 | ($523,202.13) | -0.87% |
| November 30, 2018 | $61,228,141.75 | ($1,228,141.75) | -2.05% |

As the Court can see, even assuming a $60 million valuation, the equity cushion in the Property is now under 5% - well under the 10% threshold that most courts have required to find adequate protection.  This is without accounting for even $1 of SCC's legal fees, which are also secured by the Property and have and continue to accrue.  At the $55.5 million value, the equity cushion is already gone.  Based on the foregoing, Debtors will be unable to show adequate protection through an equity cushion, or any other means, and the stay should be terminated.

---

[1] The data on the charts below is also provided in line graph format in **Exhibit "1"** attached hereto.

4834-1534-8329

2.    <u>Lucky Dragon is Going to Shut Down.</u>

As SCC has said since the beginning of this case, Lucky Dragon is not generating sufficient revenue to pay its normal operating expenses and Borrower has no revenue from which to make any payments.  This prediction has now been borne out by testimony from Lucky Dragon's General Manager, Jordan Seager. According to Mr. Seager, Lucky Dragon's ability to fund payroll on June 22, 2018 was going to be tight and may not be possible given the cash on hand.  Even if the June 22, 2018 payroll is made, Lucky Dragon will run out of cash in July. Once that happens, Lucky Dragon will need to cease operations.  As the Court has heard, closing the hotel will result in a decrease in value of the Property.

What's worse, though, is that without the cash, Debtors will be unable to even maintain and secure the Property.  Mr. Seager again testified at the hearing on DIP financing that the costs to secure and maintain the Property can still be substantial.  SCC believes that Mr. Seager has overestimated the costs to maintain and secure the Property.  Even at a much lower number than Mr. Seager estimated, though, Debtors will be unable to make the necessary payments. SCC's collateral, therefore, will be at risk of degradation or damage.  That increased risk is sufficient to grant stay relief to permit SCC to protect its collateral. SCC must be permitted to exercise its rights and remedies to protect the Property.

3.    <u>Borrower is not Paying Property Taxes.</u>

Borrower still owes over $320,000 in real property taxes on the Property.  That amount continues to accrue interest and late fees and continues to threaten SCC's lien.  Further, on July 1, 2018, we will be entering a new tax year and, given the value of the Property, the real property taxes that will become due for the 2018-19 tax year will further cut into SCC's secured claim.

Continuation of the automatic stay, particularly where Lucky Dragon will be out of money in July, any equity cushion is quickly eroding or nonexistent, and real Property taxes are already delinquent harms SCC and places it in danger of being unable to recover on the Loan. Accordingly, this Court should terminate the automatic stay and allow SCC to exercise any and all remedies with respect to the Property.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

4834-1534-8329

4.    Debtors have made Repeated Efforts to Harm SCC's Interests.

Lucky Dragon filed for bankruptcy before Borrower.  One of the things requested in Lucky Dragon's first-day motions was a surcharge against SCC. [ECF No. 4].  That request was withdrawn but renewed simultaneously with the application to employ the Mushkin, Cica & Coppedge firm. [ECF No. 229.]  The second request for a surcharge was later withdrawn but followed with the DIP Motion which sought to subordinate SCC to an additional $3 million of debt, of which over $1.6 million would be used to pay professionals who have done nothing in the case to benefit SCC.  Now Debtors have filed a plan that proposes, in one iteration, to pay SCC roughly $10 million less than it is owed while administrative claimants and unsecured creditors get paid and an operating reserve is funded.  [ECF No. 410, § V.C.]  These efforts to confiscate SCC's collateral, when combined with the foregoing, provide sufficient "cause" to terminate the stay.

**B.    Stay Relief is Appropriate Under § 362(D)(2).**

Pursuant to 11 U.S.C. § 362(d)(2), a party in interest may be granted relief from the automatic stay if: (i) the debtor does not have equity in the property; and (ii) the property is not necessary for an effective reorganization. Once the movant establishes that there is no equity in the collateral "it is the burden of the Debtor to establish that the collateral at issue is 'necessary to an effective reorganization.'"  *United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 44 U.S. 365, 375-376 (1988) (citation omitted).  "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization **that is in prospect**."  *Id.*  (emphasis added). Furthermore, there must be "a reasonable possibility of successful reorganization within a reasonable time." *Id.* (citations omitted).

As set out above, Borrower either does not have equity in the Property now or will not have equity in the very near future.  Borrower will be required, therefore, to establish that the Property is necessary to confirm a plan that a reasonable prospect of being confirmed in a reasonable period of time.  The Plan, as more fully set out below, cannot be confirmed. Debtors will be unable to show that the Plan is feasible, that it complies with the requirements of the

10

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

1 Bankruptcy Code, or that its proposal to use Borrower's assets to benefit Lucky Dragon's

2 creditors (without meeting the requirements of substantive consolidation) should be approved

3 over SCC's objection.  Debtors will be unable to do so and, in the meantime, Lucky Dragon will

4 have been required to shut down operations.  Given all of the foregoing, stay relief should be

5 granted under § 362(d)(2).

6 **C.    Stay Relief is Appropriate Under § 362(D)(3).**

7      Borrower filed an amended petition on March 7, 2018 which clarifies that it is a single

8 asset real estate case pursuant to 11 U.S.C. 101(51B).  [Case No. 18-10850-leb, ECF 27, p. 4].

9 Therefore, there is no question that the provisions of § 362(d)(3) apply.

10      "Section 362(d)(3) provides . . . that relief from the stay of acts against 'single asset real

11 estate,' . . . *must* be granted unless, within the latest of (1) 90 days after the order for relief, (2)

12 such longer period as the court determines during the initial 90 day period, or (3) 30 days after the

13 court determines that the debtor is subject to the single asset real estate provisions, the debtor files

14 a reorganization plan that ***has a reasonable possibility of being confirmed within a reasonable***

15 ***time***, or the debtor has commenced monthly payments equal to interest at the then applicable non-

16 default contract rate of interest on the value of a consensual lien creditor's interest in the

17 property." *Collier on Bankruptcy* ¶ 362.07[5] (15th Rev. Ed. 2005) (emphasis added).  In other

18 words, the conditions in §362(d)(3) are *requirements* to continuation of the automatic stay with

19 respect to single asset real estate.  "[T]he consequence of not meeting [these] requirement[s] is

20 that the automatic stay of §362 may be lifted without further ado." *In re Kkemko, Inc*., 181 B.R.

21 47, 49 (Bankr. S.D. Ohio 1995); *see also See In re CBJ Development, Inc.*, 202 B.R. 467, 470 (9th

22 Cir. B.A.P. 1996); *see also LDN Corp.*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996).

23      The 90 day period under § 362(d)(3) for Borrower passed on May 22, 2018. Lucky

24 Dragon and Borrower have made no monthly interest payments to SCC.  Accordingly, Debtors

25 will be required to establish that their Plan of Reorganization [ECF No. 410] filed on May 21,

26 2018 has a reasonable possibility of being confirmed in a reasonable time period.  For the reasons

27 set forth herein, Debtors will not be able to establish that fact.  Therefore, the automatic stay must

28 be lifted as to SCC.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

4834-1534-8329

1.     The Plan Results In Improper Substantive Consolidation.

These estates have not been substantively consolidated nor could they be. Substantive consolidation is an "extreme and unusual remedy." *In re Las Torres Development*, L.L.C., 413 B.R. 687, 693 (Bankr. S.D. Tex. 2009) (quoting Gandy v. Gandy, 299 F.3d 489, 499 (5th Cir. 2002)). "The power to consolidate should be used sparingly," *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966). The primary reason for the high standard is to avoid the harm that inevitably comes to creditors of one estate when two estates are consolidated. *In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982) ("It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors. . . . This is so because separate debtors will almost always have different ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower.") There are two "critical factors" to be considered when looking at substantive consolidation: "whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit, . . . [or] whether the affairs of the debtors are so entangled that consolidation will benefit all creditors." *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988). Neither of these factors is present in this case.

As demonstrated by the ability of Debtors to separate the vast majority of the unsecured creditors into the separate estates, there is no indication that creditors dealt with Borrower and Lucky Dragon as "a single economic unit." [ECF No. 178; Case No. 18-10850, ECF No. 28.] In fact, Borrower and Lucky Dragon, although acting in ways that greatly benefitted Lucky Dragon to the detriment of Borrower, have entered into contracts between themselves for operation of the Property.

There is also no evidence that the affairs of the Debtors are "so entangled that consolidation will benefit all creditors." First, there is no evidence that the affairs are entangled. Debtors have been able to file schedules and statements showing the separate assets and liabilities. It is clear that Borrower has all of the assets and Lucky Dragon has nearly all of the unsecured liabilities. That goes to the second part of this test – benefit to all creditors.

12

1   Consolidation here would only benefit Lucky Dragon and its professionals. Borrower's creditors

2   would be harmed by having assets that could pay their claims confiscated to pay Lucky Dragon's

3   creditors. Accordingly, substantive consolidation is not appropriate.

4          Despite being unable to show grounds for substantive consolidation, the Plan proposes to

5   take the assets of Borrower and use them to pay creditors and professionals of Lucky Dragon.

6   This is not permissible. SCC does not consent to substantive consolidation of the Debtors.

7   Therefore, Debtors cannot use the Plan to create a de facto consolidation. *See In re Central*

8   *European Industrial Dev. Co. LLC*, 288 B.R. 572, 575-76 (Bankr. N.D. Cal. 2003).

9          2.    The Plan Impermissibly Classifies Unsecured Claims and Equity Interests.

10         In any Chapter 11 reorganization, the debtor places creditor claims into separate classes

11  and each class votes to either confirm or reject the debtor's reorganization plan. At least one

12  impaired class must vote to accept the plan. 11 U.S.C. § 1129(a)(10). *CWCapital Asset Mgmt.,*

13  *LLC v. Burcam Capital II, LLC*, No. 5:13-CV-278-F, 2014 WL 2864678, at *1 (E.D.N.C.

14  June 24, 2014). Classification of claims is governed by 11 U.S.C. § 1122(a), which provides that

15  "a plan may place a claim or an interest in a particular class only if such claim or interest is

16  substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

17         There is a two-step process for bankruptcy courts evaluating claim classification. The

18  first question for the bankruptcy court when applying Section 1122(a) is whether the claims are

19  "substantially similar." *In re Loop 76, LLC*, 465 B.R. 525, 536 (B.A.P. 9th Cir. 2012) aff'd, 578

20  F. App'x 644 (9th Cir. 2014). The Ninth Circuit Court of Appeals has determined that the

21  bankruptcy judge "must evaluate the nature of each claim, i.e., the kind, species, or character of

22  each category of claims." *In re Johnston,* 21 F.3d 323, 328 (9th Cir. 1994), *as amended* (May 6,

23  1994). If the bankruptcy court determines that the claims are substantially similar, then a plan

24  may not place such claims in different classes unless the debtor can show a business or economic

25  justification for doing so. *In re Barakat*, 99 F.3d 1520, 1521 (9th Cir. 1996). A court must not

26  approve a plan treating similar claims differently solely to gerrymander an affirmative vote on the

27  reorganization plan. *Id*. at 1525 (citing *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture*

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

13

1   (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1992), cert. denied, 506 U.S.

2   821, 113 S. Ct. 72, 121 L. Ed. 2d 37 (1992).

3           ***a.***      ***The Unsecured Claims are Treated the Same Yet Separately Classified.***

4         SCC agrees that the unsecured creditors of these two estates are in much different

5   positions when it comes to the collectability of their claims. The unsecured creditors of Borrower

6   not only have the proceeds from a potential sale of the Property to look to for payment of their

7   claims, but they also have LVEIRC who is legally responsible for all claims that Borrower cannot

8   pay. Unsecured creditors of Lucky Dragon, on the other hand, should not be able to look to the

9   Property or LVEIRC to expect repayment. If these unsecured creditors were separately classified

10   and proposed to have their repayment treated differently depending on which estate is liable for

11   their claims, SCC would agree that separate classification under § 1122(a) would be appropriate.

12         The Plan does not do that. Instead, the Plan proposes to treat the unsecured creditors of

13   these two estates in three separate classes. Plan §§ III.B.3, .4, .5. Despite the separate

14   classification, Debtors propose to pay all unsecured creditors, no matter whether they have any

15   claim against Borrower, from proceeds from the sale of the Property or the equity/new value

16   contributions that are proposed to be made into Borrower. *Id.* This improperly allows creditors

17   of Lucky Dragon to confiscate assets of Borrower for repayment. Presuming the Court permits

18   this repayment structure, the separate classification of the claims is not appropriate given the

19   identical repayment. Instead, it seems designed to gerrymander a class of unsecured creditors

20   who will approve the Plan. This tactic cannot be authorized by the Court.[2]

21           ***b.***      ***The Equity Claims Should Not be in a Single Class.***

22         Debtors' treatment of the equity interests, on the other hand, lumps all equity of both

23   Debtors into one class and then proposes that equity owners, no matter which entity they

24   currently have equity in, can become equity owners in the reorganized Debtors as a single class.

25   Just as the unsecured creditors should be separately classified (with appropriately structured

26   repayment based on the assets of the Debtor they have claims against), the equity interests in the

27

28   [2] SCC further notes its objection to the Plan's proposal to subordinate SCC's claim to that of unsecured creditors as it relates to the distributions from the Equity Contribution DS, § III.A.4. This cannot be permitted.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

4834-1534-8329

Snell & Wilmer

L.L.P.

LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

1    Debtors must be separately classified. The equity interest in Lucky Dragon currently resides with

2    LVEIRC. The equity interests in Borrower, however, are presently held by LVEIRC, as the

3    general partner, and the EB-5 investors, as limited partners. These equity interests are

4    substantially different and should be placed into three separate classes and given separate

5    treatment. Lumping them into one equity class does not comport with § 1122(a). This is a fact

6    Debtors seem to recognize later when discussing how the new equity interests will be distributed.

7    *See* Plan, § V.G.

8                    ***c.      The Claim of Clark County Should Be an Unclassified Claim.***

9            Debtor places the claim of Clark County arising from Borrower's failure to pay property

10   taxes as a Class 1 Secured Claim.  DS, § III.  Section 1123(a)(1) generally prohibits placing

11   claims of a kind specified by § 507(a)(8) into a class.  Rather, the treatment of tax claims afforded

12   priority under § 507(a)(8) is mandated by § 1129(a)(9)(C).  If a secured claim of a governmental

13   unit such as Clark County "would not otherwise meet the description of an unsecured claim of a

14   governmental unit under § 507(a)(8), but for the secured status of that claim, the holder of that

15   claim will receive on account of that claim, cash payments, in the same manner and over the same

16   period, as prescribed in subparagraph (C)."  The Plan provides for payment upon the Effective

17   Date – the treatment specifically authorized by § 1129(a)(9)(C)(i).

18           The plain language of §§ 507(a)(8), 1123(a)(1) and 1129(a)(9)(D) supports the conclusion

19   that secured real property tax claims should not be classified claims.  Even if the Court were to

20   determine the claim of Clark County was properly classified, there is considerable case law

21   supporting the conclusion that the real property tax claim of Clark County cannot be the impaired

22   accepting class under § 1129(a)(10).  *In re Winters*, 99 B.R. 658, 663-664 (Bankr. W.D. Pa.

23   1989); *see also In re Bryson Properties, XVIII*, 961 F.2d 496, 501 (4th Cir. 1992) (holding that

24   unpaid ad valorem taxes did not constitute an impaired class that could accept a plan and bind

25   other truly impaired creditors to a cram down); *In re Mortgage Inv. Co.*, 111 B.R. 604, 611-612

26   (Bankr. W.D. Tex. 1990) (noting that a plan may be confirmed as long as priority tax claims are

27   not the only impaired consenting class relied upon to reach cramdown); *In re Equitable Dev.*

28   *Corp.*, 196 B.R. 889, 893-894 (Bankr. S.D. Ala. 1996) (stating that debtor would not be allowed

15

1     to use the class of priority tax creditors to provide needed acceptance of their plan). This is

2     particularly true where Clark County's claim is proposed to be paid on more favorable terms than

3     what the Bankruptcy Code would permit. *See* 11 U.S.C. § 1129(a)(9)(C).

4          3.     The Plan Violates the Absolute Priority Rule.

5        With respect to a class of unsecured claims, § 1129(b)(2)(B) provides that a plan is not

6     fair and equitable and may not be confirmed over the objection of a non-accepting unsecured

7     creditor class that will receive less than full payment if the equity holders retain their interests. *In*

8     *re Armstrong World Indus., Inc.*, 432 F.3d 507 (3d Cir. 2005). Absent a full present value

9     repayment of unsecured creditors, Debtors' equity owners are not permitted to keep anything on

10    account of their prior ownership interest. The "new value" exception to this rule would only

11    come into play if Debtors' current equity contributes, in exchange for the retention of their

12    interest, "money or money's worth" that is "reasonably equivalent in view of all the

13    circumstances to the participation of the stockholder." *Norwest Bank of Worthington v. Ahlers*,

14    485 U.S. 197, 203 (1988) (quoting *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 121-

15    22 (1939)); *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co., (In re Bonner Mall*

16    *Partnership)*, 2 F.3d 899 (9th Cir. 1993).

17        Debtors do not propose to pay unsecured creditors in full. The unsecured creditors are

18    slated to get their pro rata share of any excess sale proceeds or funds from the new equity

19    contributions. There is no estimate, however, of what percentage of their unsecured claims the

20    unsecured creditors will receive. Given the lack of a buyer for the Property who will pay SCC's

21    claim in full, much less subordinate claims such as the unsecured creditors, repayment of the

22    unsecured creditors seems unlikely from a sale of the Property. There is also no indication that

23    the Initial New Value Contribution or Equity Contribution will materialize. Accordingly, it is

24    unlikely that unsecured creditors of each estate will be paid in full.

25        The Plan's Initial New Value Contribution is not really a "new value" contribution for

26    purposes of the absolute priority rule exception. It is an equity purchase by Mr. Zhan who, as

27    SCC understands it, is not currently an equity interest holder. The only "new value" called for

28    then is the Equity Contribution. However, that contribution has no parameters at all. It simply

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

calls for 25% of the equity in the reorganized Debtors to be available to current equity owners for an unspecified contribution. Could an equity owner purchase that 25% interest for $1.00? The Plan certainly does not tell the Court.

The Plan also proposes to allow Lucky Dragon to be owned by "the entity or entities designated by the parties, such that the Debtors' licensing as a hotel and casino property will be preserved." Plan, § V(G). This creates the very real possibility that LVEIRC, Mr. Weidner, Mr. Fonfa, or some other related entity could end up with some interest in Lucky Dragon without being required to contribute anything tangible. If unsecured creditors are not paid in full, that arrangement violates the absolute priority rule. *See Ahlers*, 485 U.S. 197, 204 (1988) (finding that "sweat equity" without a tangible contribution was not sufficient to meet the "new value" exception to the absolute priority rule).

Even more troubling is how the definition of "Equity Contribution" buried at the end of the Disclosure Statement covertly creates an opportunity for Debtors' principals to obtain new equity in the reorganized Debtors by exchanging their unsubstantiated unsecured debt, which is not "new value," for the "New Equity Interests," while not offering that same opportunity to general unsecured creditors. [ECF No. 409 at 45].

4.    The Plan Is Not Feasible.

The Bankruptcy Code requires that Debtor's plan be feasible in that it is not likely to be followed by liquidation or the need for further reorganization. § 1129(a)(11); *see also Sherman v. Harbin (In re Harbin)*, 486 F.3d 510, 514 (9th Cir. 2007). The feasibility test set forth in § 1129(a)(11) requires the court to scrutinize the plan to determine whether it offers a reasonable prospect of success and is workable. *Sagewood Manor*, 223 B.R. at 762 (citing *In re Monnier Bros.*, 755 F.2d 1336, 1341 (8th Cir. 1985)).

Borrower is an entity that, although it owns the Property that is currently being used by another entity, has no income and no prospects for income. Lucky Dragon is an entity that has been provided use of the Property without paying any rent yet still has blown through $20 million in cash over the last year and a half and projects post-petition losses of over $2 million by November 2018. This is without accounting for any payment to SCC or payment of real property

Snell & Wilmer

L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

1    taxes. Further, Debtors have presented evidence to this Court that they will be out of cash

2    potentially this month. That will only leave the option of closing down operations and simply

3    preserving the Property. This cash flow and operating history is a great indicator of how the

4    Debtors will perform going forward. If Debtors propose in any way to continue operations as a

5    means of repaying their creditors, the Court cannot consider this realistic and should find that it is

6    outside the realm of a feasible Plan.

7        The Plan sets forth two other options for repayment of creditors. The first is to sell the

8    Property. Debtors, however, have been unable to present any evidence to the Court that the

9    Property can be sold for enough to pay real property taxes and SCC. As the Court has heard,

10   Debtors have been marketing the Property for nearly a year without sufficient interest. Despite

11   those prior marketing efforts, Debtors' new broker would not testify about what he thought the

12   Property might sell for or how many bidders may ultimately bid on the Property.

13       The second option under the Plan is the Zhan LOI. *See* Plan, § V(C). The issues with the

14   Zhan proposal in the Plan are legion - (i) is Mr. Zhan willing to invest the funds; (ii) is Mr. Zhan

15   able to obtain a travel visa to visit the Property; (iii) is Mr. Zhan willing to fund after visiting the

16   Property; and (iv) does Mr. Zhan have, or is he able to expatriate from China, $55 million in

17   liquid assets over the next year and a half. All of these factors make the Zhan option highly

18   unlikely to materialize and cannot be the basis for a feasibility determination.

19       5.    The Plan Violates the Provisions of Section 1129.

20       Even if the Zhan proposal does materialize, the Plan is not confirmable because it does not

21   propose to pay SCC in full. According to the distribution of funds set out in § V.C, the total of

22   the payments to be made to SCC are $45 million ($10 million on the Effective Date, $20 million

23   on the first anniversary of the Effective Date, and $15 million 545 days after the Effective Date).[3]

24   That is stretched out over either two years or a year and six months at an interest rate of only 5%.

25

---

26   [3] This is roughly $10 million short of what is owed to SCC. Particularly problematic for the Debtors is the
     Plan's proposal to use money that could be used to get closer to covering the shortfall to pay
27   administrative claims, unsecured creditors, and an operational reserve. This is just another attempt to use
     SCC's collateral to pay professionals and creditors of Lucky Dragon. In the event that there are
     insufficient funds to pay SCC in full, SCC may be left with no option but to seek disgorgement from both
28   Debtors' administrative claimants and unsecured creditors pursuant to Section 507(b).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

4834-1534-8329

1  Plan, §§ III.B.2, V.C.  Debtors have no other source of funds to pay SCC and there is nothing in

2  the Plan that suggests there will be sufficient funds to pay the remainder of SCC's claim.

3      SCC has established that it is currently owed over $52 million and will be owed over $53

4  million by the time of the DS hearing. Landa Declaration, ¶ 16.  Given the Court's determination

5  that SCC's interest are adequately protected, [ECF No. 464], and that the value of the Property is

6  somewhere between $55.5 million and $60 million, SCC's claim is currently secured and must be

7  paid in full through the Plan. 11 U.S.C. § 1129(b)(2)(A).

8                          **IV.    CONCLUSION**

9      For the foregoing reasons, SCC respectfully requests that the grant this Motion and

10  terminate the automatic stay with regards to the Property and Lucky Dragon's interest in the

11  Property.

12      DATED this 15th day of June 2018.

13                              SNELL & WILMER L.L.P.

14

15                          By:    /s/Nathan G. Kanute
                                Bob L. Olson (NV Bar No. 3783)
16                              Nathan G. Kanute (NV Bar No. 12413)
                                3883 Howard Hughes Parkway, Suite 1100
17                              Las Vegas, NV 89169
                                Telephone:  (702) 784-5200
18                              Facsimile:  (702) 784-5252
                                *Attorneys for Snow Covered Capital, LLC*

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
(702) 784-5200

4834-1534-8329

# EXHIBIT 1

# EXHIBIT 1

**EXHIBIT 1**





| | May 29, 2018 | June 30, 2018 | July 31, 2018 | August 31, 2018 | September 30, 2018 | October 31, 2018 | November 30, 2018 |
|---|---|---|---|---|---|---|---|
| Equity Percentage | -2.02% | -3.39% | -4.78% | -6.14% | -7.52% | -9.05% | -10.32% |





| | May 29, 2018 | June 30, 2018 | July 31, 2018 | August 31, 2018 | September 30, 2018 | October 31, 2018 | November 30, 2018 |
|---|---|---|---|---|---|---|---|
| Equity Cushion | 5.63% | 4.36% | 3.07% | 1.82% | 0.54% | -0.87% | -2.05% |